**STATE of Maine**

v.

**Samuel C. STONE et al.**

Supreme Judicial Court of Maine.

Aug. 22, 1972.

Michael J. O'Donnell, Asst. County Atty., Bethel, for plaintiff.

Basil A. Latty, Portland, for defendants.

Before DUFRESNE, C. J., and WEBBER, WEATHERBEE, POMEROY, WERNICK and ARCHIBALD, JJ.

WERNICK, Justice.

At the October 1969 Term of the Superior Court held in Oxford County a two count indictment, alleging violations of 17 M.R.S.A. § 201, was returned against all the defendants. One count charged that on or about the 8th day of October, 1969, defendants had committed the crime of assault, felonious in degree because high and aggravated, upon Gerald Smith, and the second count specified another victim, Richard Roberts.

In another indictment defendants, Samuel C. Stone and Seaton Frank Stone, were accused in two counts of having, on or about October 8, 1969, committed a felony (assault of a high and aggravated nature) "while carrying a firearm"—in one count Gerald Smith and in the other Richard Roberts being named as the persons assaulted (P.L.1969, Chapter 418, now 17 M.R.S.A. § 1461).

In a consolidated proceeding,[1] with jury waived, three of the defendants, Samuel C. Stone, Seaton Frank Stone, and Dustin R. Olson, were tried.[2]

Each defendant, Stone, was found guilty of the counts of the indictment charging felonious assaults. Samuel C. Stone was convicted, and Seaton Frank Stone acquit-

---

1. Other indictments were involved but they are immaterial for present purposes.

2. Because Edward C. Dowland, the fourth co-defendant named in the felonious assault indictment, was outside the jurisdiction at the time, he was not tried in the jury-waived consolidated trial.

ted, of the counts of the indictment charging the carrying of a firearm while engaged in the commission of a felony.[3]

The "Stones" (hereinafter "defendants") have appealed from the judgments of conviction entered, respectively, against each of them.

I

On one comprehensive basis (variously phrased) defendants contend that the convictions must fall because the trial Court explicitly rested them upon a foundation that defendants had been engaged in frustrating a lawful arrest by Gerald Smith, a State police officer, of one, Edward C. Dowland, for the offense of carrying a loaded firearm in a motor vehicle—a misdemeanor in violation of 12 M.R.S.A. § 2456.[4] Defendants assert that this foundation is, on the evidence and with the correct law applied, unsound.

Defendants claim unlawfulness in the purported arrest by Trooper Smith on three alternative grounds; either (1) the legality of the arrest must be held vitiated because it was bottomed, from the very outset, upon an unlawful intrusion into the private interior of an automobile occupied by the defendants (and Dowland); or (2) in any event, a subsequent warrantless seizure by the Trooper of property from within the interior of the automobile, and a search of it, upon which the purported arrest was based, were illegal because made without valid probable cause to justify the seizure and search; or (3) in the final analysis, probable cause, even if conjoined with exigent circumstances, is inadequate under Maine law to support a warrantless arrest of the person for a misdemeanor; and, therefore, consistently with the federal Constitution and the law of Maine, it must be likewise insufficient to justify a warrantless search and seizure of property asserted to be legally subject to police search and seizure solely because of probable cause to believe that a person has committed a misdemeanor—i. e., that the property is thought to be the fruits, instrumentality or evidence of such misdemeanor.

We find each of these contentions without merit. We decide that the trial Court correctly convicted the defendants on the basis that the arrest undertaken by Trooper Smith was lawful.

---

3. The trial Judge acquitted defendant, Dustin R. Olson, under both counts of the felonious assault indictment in which he had been named as a co-defendant.

4. Although counsel for the Stones had not raised the point, the trial Judge observed that in defining the offense contemplated by 17 M.R.S.A. § 1461 (committing a felony while carrying a firearm) the legislature had failed to specify whether the firearm must be loaded. To protect such rights on appeal as the defendant, Samuel C. Stone, who was convicted of this offense, might seek to assert, the trial Judge made an explicit statement that there was "complete absence of evidence that the rifle which he [Samuel C. Stone] was carrying was loaded."

In his appeal the defendant, Samuel C. Stone, has continued to disregard this issue. No specific reference had been made to it in the designation of points on appeal, and no claim of it has been made either in the briefs submitted to this Court or in the oral argument before this Court. Rather, counsel for Samuel C. Stone has restricted his attack upon the validity of the conviction of Samuel C. Stone for carrying a firearm in the commission of the felonies of assaults, high and aggravated in nature, to the argument that the evidence is legally inadequate to establish that felonious assaults had occurred.

We, therefore, treat as waived both at the trial and appellate levels any claim by defendant, Samuel C. Stone, that 17 M.R.S.A. § 1461 can be violated only if the State proves beyond a reasonable doubt that the firearm, carried during the commission of the felony, had been loaded.

In this posture of the case it will be sufficient that we now observe, without deciding, that (1) the literal language of the statute is broad enough to cover a firearm loaded or unloaded, and (2) ample policy reasons can be envisioned which would support a legislative design that the loaded or unloaded condition of the firearm should be immaterial.

In support of the specific rationale utilized by the trial Court the evidence permits findings, beyond a reasonable doubt, of the following facts.[5]

On October 8, 1969, Trooper Smith, accompanied by a nonpoliceman cousin and friend, Richard Roberts, was on routine police duty in the Town of Upton, Maine. In the discharge of his duties Trooper Smith, at approximately 9:00 p. m., was at a house located on the Mill Hill Road, so-called, to serve a subpoena. While leaving, he observed an automobile, carrying New Hampshire registration plates, go past the house; several persons were in the car.

The vehicle was proceeding on the Mill Hill Road, a backroad, towards a dead-end approximately three-tenths of a mile distant. The surrounding area was generally wooded but at the dead-end there was a large field of high grass, bushes and goldenrod with the terrain rolling gently toward a lake. Nearby was a boat house used for access to and from a hunting lodge situated on an island.

Thinking, initially, that the occupants of the automobile "might be teenagers with liquor", Trooper Smith followed the car. At the dead-end, the automobile stopped without any signal from the Trooper. It was facing so as to make an angle with the road.

Trooper Smith stepped from the police cruiser (which he had brought to a stop behind and very close to the other motor vehicle), leaving his headlights shining on high beam in the general direction of the stopped automobile. He approached the vehicle from the driver's side. While slightly distant from the car, he directed his five cell battery flashlight so that it shone upon and illuminated the back seat of the automobile. On the back seat Trooper Smith saw a 30 calibre carbine rifle with the clip inserted.

While he stood beside the driver's window, Trooper Smith observed three adult men, two sitting in the front seat and one in the rear. He asked the person in the driver's seat (whom Trooper Smith recognized as someone previously known to him as "a Stone") for his license and registration. The man identified himself as Seaton Frank Stone and stated that his operator's license was at home. The man in the back seat told Trooper Smith that the automobile was "his." He gave his name as "Eddie Dowling" (as the Trooper then heard it) and added that the automobile was actually registered in the name of his brother-in-law, Robert LeClaire, of Holbrook, New Hampshire.

Thereupon, Trooper Smith opened the rear door of the automobile (on the driver's side) and removed from the rifle lying on the rear seat the clip which was inserted in the rifle. He saw that "the top of this clip was full." Trooper Smith then informed Edward C. Dowland, who was sitting alone in the immediate vicinity of the rifle, and who was claiming to be the owner of the automobile, that he was "placed . . . under arrest for carrying a loaded firearm in a vehicle",—a *misdemeanor* crime.

The evidence as to what subsequently occurred is sharply in dispute. The trial Court made no specific findings of fact except to arrive at the general factual conclusions that, *the arrest being treated as a lawful arrest,* (1) the subsequent conduct of defendants constituted assaults against the officer and Richard Roberts, high and

---

5. The trial Court had not been requested (under Rule 23(c) M.R.Crim.P.) to make, and made no, extended findings of all the underlying facts essential to the Court's specific legal conclusion that Trooper Smith was in process of effecting a legally valid arrest of Edward C. Dowland.

Hence, in accordance with a fundamental principle governing appellate review, we consider the evidence in the light which tends most favorably to support such subsidiary conclusion of law specifically made an actually relied upon by the trial Court.

aggravated in nature, and (2) defendant, Samuel C. Stone, participated in the commission of such felonious assaults "while carrying a firearm."

These general factual conclusions of the trial Court are amply supported in the record. There is adequate evidence that the defendants, with Samuel C. Stone ulilizing a rifle at close range, frustrated the arrest by rendering the Trooper physically helpless under the intimidation of being shot, disarming him and causing him, and his companion, to prostrate themselves face down on the ground and to remain in that position for a substantial period of time while efforts were made to disable the police cruiser and allow defendants to depart without immediate danger of pursuit by the Trooper.[6]

I–A

■ When Trooper Smith caused artificial light rays from his flashlight to pass into the interior of the "Dowland" automobile and illuminate the rifle on the back seat, he acted without unlawful intrusion into a constitutionally protected area since the property is correctly held to have been knowingly exposed to public view, United States v. Lee, 274 U.S. 559, 47 S. Ct. 746, 71 L.Ed. 1202 (1927)—recently cited in Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971) and Harris v. United States, 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968) as illustrative of the principle that an owner can be held to have exposed property to public

---

6. It has been suggested that the issue of the legality of the arrest may be avoided and the convictions sustained by resort to alternative legal theories. On the hypothesis that the arrest was unlawful, these other options are: (1) if the Trooper had never made a physical attempt to place the intended arrestee (Dowland) in custody, physical resistance by the arrestee himself would have been unjustified, State v. Robinson. Aplt., 145 Me. 77, 72 A.2d 260 (1950) and, therefore, a fortiori, defendants (the "Stones"), non-parties to the arrest in question,—(and even if it be recognized that they might have had a legal right to come to the aid of the arrestee lawfully resisting, or entitled to resist, Thompson v. State, 37 Ala.App. 446, 70 So.2d 282 (1954); State v. Parker, 378 S.W.2d 274 (Mo.1964); Purdy v. United States, 210 A.2d 1 (D.C.C.A. 1965), see also: 6 Am.Jur.2d Assault and Battery § 63, at p. 58)—would be without derivative right to use physical force to assist the arrestee who himself lacked a primary right of physical resistance; or (2) in any event, the degree of resistance by defendants was excessive— more particularly if, had there been physical efforts by the officer to assert custody of the arrestee, the officer had sought to abandon them.

The difficulty encountered, were these alternative approaches to be undertaken, is that the evidence is in dispute as to key facts essential to the applicability of the alternative legal principles—e. g.: whether the Trooper was in fact the first to resort to physical force to effectuate the arrest of Dowland (there being testimony that the Trooper had immediately taken out his gun); whether if he did, the initial responding force used by the defendants was, or was not, excessive; and if it was not initially excessive whether it later built up to become excessive in light of the Trooper's subsequent conduct, including any possible efforts by the Trooper to abandon the arrest. The trial Court did not make explicit findings of fact in relation to these critical factual matters.

Clearly, at the appellate level, we may not ourselves provide the needed findings, as findings of fact; this would be an improper invasion of the domain of the factfinder. Further, even were the evidence to satisfy us that the requisite findings had been established as the only conclusions properly open to a rational fact-finder, the serious problem remains that in a criminal case, in view of the well-established principle prohibiting *court-directed* findings of fact bearing upon essential elements of the crime, an appellate tribunal might lack the power to resort to new fact-finding ' of its own albeit the evidence allows no other findings as rational.

We have chosen, therefore, to avoid these problems in the disposition of the case at bar and to decide the case by deciding the issue of the legality of the purported arrest of Dowland—especially since by such approach, as shown hereinafter, the trial Court is found to have made a correct decision.

view notwithstanding that artificial illumination, specifically directed, might be required to render the property visible. Other cases considering the point have agreed with virtual unanimity.[7]

## I–B

■ Hence, without any unlawful initial intrusion into the interior of the automobile, Trooper Smith saw, as knowingly exposed to public view (even though inside the automobile), a 30 calibre carbine rifle in which the clip had been inserted, immediately adjacent to a man, sitting alone, who claimed to be the owner of the automobile.

Under all of the circumstances—including, in particular, that the clip was already in place in the rifle, the time of year was, or was close to, the hunting season, the time of day was at night, the automobile containing three adult men was parked at the dead-end of a road, and the general terrain of the area to which the automobile had been driven embraced a large field surrounded by more or less woods,—there was probable cause for Trooper Smith to believe that the clip in the rifle contained a cartridge or shell, thereby to be immediately ready for on the spot hunting (if nothing else). See: State v. Fletcher, Me., 288 A.2d 92 (1972) and Adams v. Williams, 407 U.S. 143, 92 S.Ct. 1921, 32 L. Ed.2d 612 (1972) for further elucidation of the meaning of "probable cause" in this context.[8]

There was thus probable cause to support a belief that Mr. Dowland, as the sole occupant of the rear seat and the asserted owner of the automobile, was committing a violation of 12 M.R.S.A. § 2456 which makes it a msidemeanor crime

". . . for any person, excepting a law enforcement officer while in the line of duty, to have in . . . a motor vehicle . . . any rifle . . . with a cartridge or shell in the chamber, magazine, clip or cylinder."

The probable cause to believe that a misdemeanor was being committed was accompanied by additional circumstances sufficiently exigent to authorize the warrantless minor intrusion into the interior of the automobile by which Trooper Smith took the clip to look for shells in it—the clip and shells being, potentially, instrumentalities of the violation of 12 M.R.S.A. § 2456.

The automobile was still in condition to be readily operable and was thus continuingly mobile, capable of being driven off at any moment by the operator who was still seated behind the wheel. At any time, therefore, the instrumentalities of the crime, believed upon probable cause to be in process of commission, could be removed, concealed, destroyed or otherwise disposed of or lost, were the officer to attempt to procure a warrant. Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925); Chambers v. Maroney, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970); cf. also, State v. Fletcher, supra, at footnote 4.

---

7. United States v. Pearson, 448 F.2d 1207 (5th Cir. 1971); Walker v. Beto, 437 F. 2d 1018 (5th Cir. 1971); Marshall v. United States, 422 F.2d 185 (5th Cir. 1970); United States v. Hanahan, 442 F.2d 649 (7th Cir. 1971) (flashlight into a garage); Dorsey v. United States, 125 U.S.App.D.C. 355, 372 F.2d 928 (1967); Commonwealth v. Haefeli, Mass., 279 N.E.2d 915 (1972); Rudolph v. Commonwealth, Ky., 474 S.W.2d 376 (1971); State v. McMillin, 206 Kan. 3, 476 P.2d 612 (1970); Scales v. State, 13 Md.App. 474, 284 A.2d 45 (1971). Cf. United States v. Booker, 461 F.2d 990 (C.A. 6, 1972) (McCree, J., dissenting in part)

Contra: Pruitt v. State, 389 S.W.2d 475 (Tex.Cr.App.1965).

8. In Adams v. Williams, supra, the Supreme Court of the United States quotes the language set forth at an earlier time in Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949): "In dealing with probable cause, . . . , as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." (p. 175, 69 S.Ct. p. 1310)

### I–C

This brings us to the important question whether, because the ultimate criminal activity involved was *only a misdemeanor* for which, under Maine law, Trooper Smith was without lawful authority to make a warrantless *arrest of the person upon probable cause* (no matter how exigent the circumstances) Caffinni v. Hermann, 112 Me. 282, 91 A. 1009 (1914); Palmer v. Maine Central Railroad Company, 92 Me. 399, 42 A. 800 (1899), Trooper Smith violated federal Fourth-Fourteenth Amendment constitutional prescriptions, or the law of Maine, when he removed the clip from the rifle to look for a shell in it— both clip and shell being instrumentalities of a misdemeanor.

■ On the federal constitutional aspect, we are satisfied that the combined import of Carroll v. United States, supra, Warden, Md. Penitentiary v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967), and the more detailed elaboration of Chambers v. Maroney, supra, settles that Trooper Smith acted without violation of the federal Constitution.

■ The prohibition in State law against a warrantless arrest of the person, upon probable cause, for a misdemeanor is not, ipso facto, absorbed into the federal Constitution as an automatically controlling constitutional limitation upon warrantless searches and seizures of property in misdemeanor situations.

The attempt to accomplish such constitutional restriction was explicitly repudiated in Carroll v. United States, supra.

If any doubt has persisted that because *Carroll* involved contraband (in and of itself subject to seizure without relationship to criminal conduct by a person), *Carroll*, therefore, lacks application to property which becomes lawfully liable to search and seizure only by virtue of its relationship to the criminal conduct of a person, Chambers v. Maroney has obliterated any legal significance in such distinction.

Chambers v. Maroney reveals a development in cases from *Carroll* to Chambers v. Maroney itself of four basic principles.

First, the *Carroll* doctrine has been extended to cover not only contraband but also any "articles that the officers are entitled to seize." (399 U.S. p. 48, 90 S.Ct. p. 1979) [9]

■ Second, State law may constitutionally establish, within the outer limits of the "reasonableness" criterion of the federal Fourth Amendment,[10] that property is liable for search and seizure if it is the fruits of or implements used to commit a crime or, as finally decided in Warden, Maryland Penitentiary v. Hayden, supra, evidence of a crime.

■ Third, the kind of crime as to which State law may constitutionally make property subject to search and seizure, as the fruits of or instrumentality or evidence of such crime, may be either a misdemeanor or felony—as shown by Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949); Preston v. United States, 376 U.S. 364, 84 S.Ct. 881, 11 L. Ed.2d 777 (1964), and Dyke v. Taylor Implement Manufacturing Co., Inc., 391 U.S.

9. That *Carroll* is thus extended by Chambers v. Maroney is brought into sharp focus by the partial dissent of Justice Harlan. He says in footnote 7 of his opinion, at page 62, of 399 U.S., at page 1987 of 90 S.Ct.: "The Court disregards the fact that *Carroll*, and each of this Court's decisions upholding a warrantless vehicle search on its authority, involved a search for contraband. . . . Although subsequent dicta have omitted this

limitation, . . . the *Carroll* decision has not until today been held to authorize a general search of a vehicle for evidence of crime, without a warrant, in every case where probable cause exists."

10. See: Ker v. California, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963) as delineating that State law provides the foundation but federal law imposes the bounds.

216, 88 S.Ct. 1472, 20 L.Ed.2d 538 (1968), all of which involved criminal activity punishable only at the misdemeanor level.

■ Fourth, if State law has subjected property to search and seizure, by warrant, as fruits, or instrumentality or evidence of any crime—(misdemeanor or felony)—*so long as probable cause exists*, the warrant requirement may be constitutionally dispensed with if there are exigent circumstances which demand immediate search and seizure, or both, to prevent likelihood of removal, concealment, destruction or other loss of the articles lawfully subject to seizure provided, of course, that the search and seizure is limited as to method, place and time to be commensurate with such exigency.

■ Thus, although Chambers v. Maroney happens to involve, on its particular facts, a crime (a felony) as to which the local State law authorized a warrantless arrest upon probable cause, its rationale and doctrine establish an ultimate principle that State law limitations upon warrantless *arrests* of *the person* for criminal conduct are not required, constitutionally, to be carried over as an automatic restriction upon warrantless *searches and seizures of property* which becomes lawfully subject to seizure only because it bears a relationship to such criminal behavior of the person.[11]

■ It is, therefore, constitutional for the law of Maine (1) to follow the common law rule *denying* the right of a police officer upon probable cause (and even with exigent circumstances) to make a warrantless arrest of the person for a misdemeanor but yet (2) simultaneously to *authorize*, upon probable cause and in exigent

circumstances, searches and seizures—(by *methods and at times and places commensurate with the exigency presented*)—of articles related to misdemeanor criminal behavior as the fruits, instrumentality or evidence of such criminal activity.

■ We now decide that the law of Maine has made precisely such choice, constitutionally open to it. We interpret the references to "a criminal offense" and "a particular apprehension or conviction" contained in Rule 41(b)(2) and (4) M.R. Crim.P.[12] (implementing the authorization conferred by 15 M.R.S.A. § 55) to mean what they say literally—namely, "a criminal offense", regardless of whether it is a misdemeanor or felony, and "a particular apprehension or conviction", whether it be of a misdemeanor or felony.

■ Since the law of Maine thus recognizes, foundationally, the lawfulness of such searches and seizures *upon issuance of a warrant* supported by probable cause, we hold (as we are constitutionally free to decide under Chambers v. Maroney) that the same searches and seizures may be made *without a warrant*, notwithstanding that the criminal conduct which makes the property lawfully subject to seizure is only a misdemeanor; provided that (a) there is probable cause, (b) there are *accompanying exigent circumstances* which make procurement of the warrant impracticable, and (c) the methods, time and place are reasonable under all of the circumstances constituting the exigency, see Coolidge v. New Hampshire, supra,—including, as one circumstance, that the crime involved is a misdemeanor rather than a felony.

We are induced to allow this difference in the law of Maine between warrantless arrests of the person and warrantless

---

11. Chambers v. Maroney crystallizes this point explicitly in footnote 6 at page 47 of 399 U.S., at page 1979 of 90 S.Ct. by the statement: ". . . the validity of an arrest is not necessarily determinative of the right to search a car if there is probable cause to make the search."

12. Item (4) was added by amendment, effective October 4, 1967, after the decision in Warden Md. Penitentiary v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed. 2d 782 (1967) to include, as a fourth ground, property "consisting of non-testimonial evidence which will aid in a particular apprehension or conviction."

(probable cause exigency) searches for, and seizures of, property—in relation to misdemeanor criminal activity—by the consideration that police invasions against property will, generally, cause a sufficiently lower degree of personal indignity, anxiety and other potential for damage than intrusions upon the sanctity of the human person and personality; and hence, the magnitude of the danger to the public interest to counterbalance the potential evil of interference with privacy—(should the probable cause belief eventuate as incorrect in fact)—need not be so great as to impose the limitation that the crime involved must be of the felony, rather than misdemeanor, level of seriousness.

### I–D

 As the result of a *lawful* seizure and search, Trooper Smith ascertained that in the automobile was a 30 calibre carbine rifle in which a loaded clip was inserted. He then *lawfully knew* that a misdemeanor, constituted by a violation of 12 M.R.S.A. § 2456, had been, and was continuingly being, committed in his presence. He then had lawful authority to arrest without a warrant under 15 M.R.S.A. § 704.

The arrest being lawful, the evidence amply supports the trial Court's conclusions, as previously mentioned (pp. 687–688), that the acts of the defendants toward Trooper Smith and Richard Roberts were assaults upon them, high and aggravated in nature and that defendant, Samuel C. Stone, carried a firearm in committing these felonies.

### II

Defendants seek to invalidate the judgments of conviction against them by an attack on the jurisdiction of the Court which adjudicated the convictions. Jurisdiction is said to be lacking because presence of the defendants within the territorial jurisdiction of the Court was achieved by the lawless conduct of Maine law enforcement officials who brought defendants from New Hampshire to Maine by physical abduction.

Since the trial Court made neither findings of fact nor ultimate conclusions of law upon important aspects of the merits of the legal contentions of defendants now being examined, except to assert jurisdiction to find defendants guilty in specific respects, we shall dispose of them in this appeal by hypothesizing that state of facts which the evidence permits when it is considered most favorably to the defendants.

Within twenty-four hours after the episode with Trooper Smith and his companion, Richard Roberts, the defendants were apprehended in New Hampshire and there detained by local authorities. Maine law enforcement officials were notified and immediately went to New Hampshire. One of them placed the defendants in handcuffs. While thus subjected to physical impairment and under the coercion of the ostensible official authority being asserted by the Maine officers, in conjunction with assistance from New Hampshire police, defendants, against their wills, were physically transported by the Maine officials from New Hampshire into the State of Maine and were then placed under the exclusive control of Maine law enforcement officers.

The argument offered by defendants is fundamentally ambiguous. At times, defendants seem to be asserting a lack of jurisdiction of the trial Court *over their persons* and for the purposes only of the instant proceedings.[13] On this basis, the remedy could be that the convictions be set aside, the defendants released and returned to New Hampshire and the State of Maine

---

13. The trial Judge appears to have assumed this interpretation of the position of defendants. He indicated, therefore, that the issue should have been raised at least before the commencement of the trial on the merits through appropriate motions. Hence, he regarded the subsequent participation of the defendants in the trial on the merits, without attacking the Court's jurisdiction of their persons, as a fully voluntary submission of their persons to the jurisdiction of the Court.

be required to obtain jurisdiction of the persons of defendants lawfully, by appropriate interstate rendition proceedings, if necessary,[14]—thereafter to have the defendants face another prosecution.

Other formulations of defendants' contentions, however, seem to invoke a principle analogous to the "evidence exclusionary" doctrine applied since 1914 in federal Court prosecutions, Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914) and more recently, since 1961, required also in state Court prosecutions, Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081(1961); Ker v. California, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963).[15] Defendants seek to extend the doctrine to embrace not merely the exclusion of evidence from a prosecution but the permanent exclusion of the prosecution itself.

Whichever of the foregoing two points of view be the purport of the contention of the defendants, we reject the validity of either of them as a basis on which the present conviction of the defendants can be held erroneous.

██ If the position of defendants be that the trial Court lacked jurisdiction *of the persons* of the defendants, the view of the trial Court was correct that the issue of jurisdiction of the person was waived, or forfeited, because defendants had omitted to raise it in any respect before submitting to, and acquiescing in, the trial of the charges on the merits. Rule 12(b)(2) M.

R.Crim.P., as further elucidated in *Glassman,* Maine Practice, Rules of Criminal Procedure, Commentary at p. 110.

Insofar as defendants purport to go further, however, and contend for a lack of jurisdiction of the cause (in effect, a permanent immunity from prosecution), we note, at the outset of analysis, that as early as 1886 the Supreme Court of the United States in Ker v. Illinois, 119 U.S. 436, 7 S.Ct. 225, 30 L.Ed. 421 (1886) held that nothing in the Constitution of the United States mandates that a Court must be *divested of jurisdiction* to try charges of crime against a defendant *solely because the defendant had been brought into the territorial jurisdiction of the Court against his will by the unlawful behavior of law enforcement officials.*

This principle was broadly reaffirmed in 1952 by a unanimous decision in Frisbie, Warden v. Collins, 342 U.S. 519, 72 S.Ct. 509, 96 L.Ed. 541 (1952).

As of that time, State Courts also had decided, with virtual unanimity,[16] that neither their State Constitutions required, nor sound public policy considerations justified, a doctrine that physical presence of a defendant within the territorial jurisdiction of a Court achieved through kidnapping, illegal arrest or physical abduction by police officers permanently divests the Court of jurisdiction to conduct a trial of the criminal charges to answer to which defendant's physical presence was wrongfully effected. The appropriate supporting cases are col-

14. Both Maine and New Hampshire have adopted, with minor variations, the Uniform Criminal Extradition Law. 15 M.R.S.A. §§ 201–229; N.H.R.S.A., Chapter 612.

15. Prior to being constitutionally obliged by *Mapp* and *Ker,* supra, to follow an exclusionary rule for evidence acquired by Fourth Amendment violations, Maine had declined to provide such sanction. See: State v. Schoppe, 113 Me. 10, 92 A. 867 (1915).

16. One exception, at least in part, as of 1952, might have been the State of Kansas

in which, if unlawful *violence* had been used by law enforcement officials to bring the defendant before a Kansas Court for trial, the jurisdiction of the Court to proceed with trial might be divested. State v. Simmons, 39 Kan. 262, 18 P. 177 (1888); but see: State v. Wellman, 102 Kan. 503, 170 P. 1052 (1918) in which the Kansas Court, by dictum, had substantially mitigated the principle of State v. Simmons.

In any event, as of 1965, Kansas fell into line with the otherwise unanimous current of authorities by its decision in State v. Wharton, 194 Kan. 694, 401 P.2d 906 (1965).

lected in Annotations: 96 A.L.R. 982; 165 A.L.R. 947.

In our view, the validity of this position has been unaltered by the evidence-exclusionary doctrine imposed upon the States by decisions of the Supreme Court of the United States, subsequently to 1952, in Mapp v. Ohio, supra, and Ker v. California, supra. It is now more than eleven years since the decision of *Mapp*. Defendants have cited to us no decision, and none has otherwise come to our attention, either by the Supreme Court of the United States or by any other federal or state Court of last resort, which, whether on a constitutional basis or for public policy reasons, reveals a departure from the law on the matter at hand as it had been previously developed with overwhelming uniformity.

Recently, at least one scholar who has addressed himself to a comprehensive study of the *Mapp* evidence-exclusionary rule has argued that since the literal language of the Fourth Amendment guarantees the security of the person as well as the security of property, unlawful seizure of the person, by improper arrest or physical abduction, violates the command of the Fourth Amendment no less than improper seizure of property. Hence, it

". . . is not readily apparent why the exclusion of illegally obtained evidence may be a proper way to deter illicit police activity while the divesting of jurisdiction is not." Pitler, "The Fruit of the Poisonous Tree" Revisited and Shepardized, 56 Cal.L.Rev. 579, 600 (1968)

We find the theory unpersuasive. We believe that (1) it incorrectly underemphasizes one value clearly relied upon as an underpinning for the *Mapp* doctrine and, correlatively, (2) confers upon the objective of deterrence of lawless behavior by law enforcement officials, taken in and of itself, a value primacy so overwhelming that it demands to be fulfilled by any sanction reasonably likely to foster it—regardless of the magnitude of injury concomitantly inflicted upon the public welfare in other respects.

Manifestly, the purpose to deter unconstitutional police behavior was a high priority value in the original formulation of the *Mapp* evidence-exclusionary principle, and it has received increasing emphasis in the more recent delineation of the application of the doctrine in particular situations. Yet, we think it likewise clear that *Mapp* was seriously concerned with an independently important societal value which it would be error to overlook, ignore or minimize.

This independent consideration relates to the "integrity" of the guilt-adjudication process. Here, "integrity" is not used to signify the *reliability* of the process as a *truth*-finding mechansim since it is clear that the evidence acquired by unconstitutional police conduct is excluded under the *Mapp* principle without assessment of, and notwithstanding, its trustworthiness to assist in the search for truth. Rather, the thrust is upon the prophylactic preservation of the *decency and dignity* of the guilt-adjudication process. The concern is, first, that the very contact, in any respect, of the process with evidence acquired by the constitutional behavior of law enforcement officials—even if only to have the fact-finder evaluate whether the reliability of the evidence has been impaired in the particular instance—demeans the process; and, second, there is inevitably a denigration of any system of justice which allows its judgments of guilt to be attributable in any part to the unconstitutional conduct of law enforcement officials who, precisely because of that function, must be maintained as exemplars of the ideal of a government of law rather than represented as having effectively assisted, by their lawless behavior, in the accomplishment of a conviction of crime.

The concern for protection of the *decency and dignity* of the judicial guilt-adjudication process—independently of its truth-finding reliability—was utilized by the Su-

preme Court of the United States to render plausible the resort to the federal Fourteenth Amendment guarantee of "due process of law" as the constitutional mechanism to subject criminal trials in all state Courts to the evidence-exclusionary rule as already operative in federal Court prosecutions under *Weeks*. See also: Ker v. California, supra.

Mapp categorically stated that *Weeks* itself, as far back as 1914,

". . . meant, quite simply, that 'convictions by means of unlawful seizures . . . should find no sanction in the judgments of the courts . . .'." (367 U.S. p. 648, 81 S.Ct. p. 1688)

*Mapp* further emphasized that this point was a reaffirmation of the principle that ". . . the very least" that is to be expected of any guarantee of the federal Bill of Rights, and the reason that it is made applicable to the States under the due process clause of the federal Fourteenth Amendment, is that it

". . . assure[s] . . . that no man is to be convicted on unconstitutional evidence. . . ." (p. 657, 81 S.Ct. p. 1692)

Finally, it was stressed that the decision in *Mapp*

". . . gives to the individual no more than that which the Constitution guarantees him, to the police officer no less than that to which honest law enforcement is entitled, *and, to the courts,*

*that judicial integrity so necessary in the true administration of justice.*"' (p. 660, 81 S.Ct. p. 1694) (emphasis supplied)

Mr. Justice Black, dissenting with Mr. Justice Douglas in Linkletter v. Walker, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965), took extraordinary pains to assert a strong reminder of

". . . the Court's resounding promises throughout the *Mapp* opinion that convictions based *on . . . 'unconstitutional evidence' would ' "find no sanction* in the judgments of the courts," ' . . . ." (pp. 640, 641, 85 S.Ct. p. 1744) (emphasis supplied) [17]

In the present situation in which the unconstitutional behavior of law enforcement officials relates only to the manner in which the defendants were brought within the territorial jurisdiction of the Court, there is, however, no such direct, or proximate, threat to a legitimate "due process of law" interest that the *guilt-adjudication* process be protected from contamination. While "process of law" might be said to be involved,—if only in the respect that defendants had been produced within the territorial jurisdiction of a Court by government officials, acting under the cloak of the authority of law,—the relationship to the ultimate deprivation of liberty resulting from defendants' convictions of crime is too remote and tenuous to bring into play a violation of *"due* process of law" as the instrumentality to establish a divestment of subject-matter jurisdiction binding upon every Court in the land under the federal Fourteenth Amendment.

17. The stress upon this aspect of the "integrity" of the *guilt-adjudication* process—in the sense of its dignity and decency *as distinguished from its* reliability as a source of truth—was insufficient to convince the Court majority in Linkletter v. Walker, supra, that the evidence-exclusionary principle of *Mapp* should be given retrospective application. The Court majority chose to make the critical criterion of retrospectivity the extent to which the principle involved was directly concerned with the trustworthiness of the adjudicatory process as an instrumentality to achieve truth.

Yet, even though the preservation of the decency and dignity of the guilt-adjudication process was thus without sufficient cogency to confer retrospective vitality upon the *Mapp* evidence-exclusionary doctrine, its importance as a strong underpinning of the *Mapp* evidence-exclusionary principle is not to be ignored or underestimated.

This is precisely the point intended by Mr. Justice Black in Frisbie v. Collins, supra, by his statement (incisive but perhaps overly concise):

". . . due process of law is satisfied when one present in court is convicted of crime after having been fairly apprized of the charges against him and after a fair trial in accordance with constitutional procedural safeguards." (342 U.S. p. 522, 72 S.Ct. p. 512)

More recently, the point has been cogently elucidated in United States ex rel. Orsini v. Reincke, D.C., 286 F.Supp. 974 (1968); aff. 2 Cir., 397 F.2d 977 (memorandum); cert. den. 393 U.S. 1050, 89 S.Ct. 689, 21 L.Ed.2d 692 (1969). The Court said:

"In testing whether 'due process of law is satisfied,' Frisbie v. Collins, . . . concern is only with constitutional violations which have a prejudicial effect upon the guilt determining process at the trial. The relationship between the remote concept of an illegal arrest and a later conviction of the arrestee at a trial is established only when there is a functional link between the two. It is not the rupture of a defendant's privacy— whether of his home, or his person—but the use of the fruits of that unconstitutional intrusion to obtain his conviction that is forbidden, e. g., the admission at the trial of evidence obtained by an unlawful search and seizure. [citing cases]." (p. 977)

Thus, there is absent, in the instant context, a primary concern of *Mapp* which highlighted "due process of law" as the appropriate functional mechanism to impose an evidence-exclusionary rule upon all State courts—the danger of a contamination of the decency and dignity (and, in this sense, the "integrity") of the guilt-determining process of the trial.

■■■ For this reason alone there is dissipated any cogency in defendants' contention that the due process clause of the Fourteenth Amendment to the federal Constitution requires that the Court in the present case be permanently divested of jurisdiction to undertake the guilt-adjudication process for the crimes charged.

■■■ Remaining for evaluation, then, is only the question of whether in terms of public policy considerations, absent federal constitutional imperatives, the benefit to society which derives from reasonable efforts to deter the kind of lawless conduct by law enforcement officials here involved is, in and of itself, a value of such overwhelming primacy that, to further it, a remedy likely to be effective—divestment of jurisdiction resulting in the conferring upon defendants of permanent immunity from prosecution—should be utilized.

This case represents the first time that this Court has had opportunity to speak on the subject.[18] Strongly as we disapprove of lawlessness in the conduct of officials who are sworn to enforce and preserve law and intensely as we desire to discourage it, we are satisfied, nevertheless, that we should be acting unwisely, and with significantly more harm than good to the public weal, were we to adopt a sanction so drastic that it eliminates the guilt-adjudication process in its entirety.

The cost to the public interest is already sufficiently high when, by the "evidence-exclusionary" rule of *Mapp*, we inflict, in the words of Mr. Chief Justice Burger, "capital punishment" (p. 419, 91 S.Ct. p.

18. In State v. Boynton, 143 Me. 313, 62 A.2d 182 (1948) (prior to *Mapp*) this Court dealt with the legal effect upon the jurisdiction of the Court of an illegal arrest of the defendant made *within the* *territorial limits of the State.* It was held that no "immunity bath for crime" results and "a new and independent prosecution for the same crime . . ." may be had. (p. 322, 62 A.2d p. 188)

2016 of dissenting opinion in Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971) ) on *evidence* produced by the unconstitutional conduct of law enforcement officials. We should extract a price from society grossly exorbitant, in our view, compared to the value likely to be received (through potential gain in the cause of police conduct deterrence) were we to confer upon defendants the benefit of permanent immunity from prosecution notwithstanding that their guilt, or innocence, of the crimes charged against them had already been (as here), or could be, adjudicated in a trial fairly held and in full compliance with all constitutional safeguards.

As to each defendant, the entry is:

Appeal denied.

All Justices concurring.