STATE of Maine

v.

Earle C. COWPERTHWAITE, Jr.

Supreme Judicial Court of Maine.

March 19, 1976.

174

Michael E. Povich, County Atty., Ellsworth, for plaintiff.

Libhart & Farris, by Wayne P. Libhart, Brewer, for defendant.

Before DUFRESNE, C. J., and WEATHERBEE, POMEROY, WERNICK, and ARCHIBALD, JJ.

DUFRESNE, Chief Justice.

Earle C. Cowperthwaite, Jr., the defendant-appellant, was convicted by a Superior Court jury (Hancock County) of the crime of night hunting in violation of 12 M.R.S.A. § 2455 and of failing to stop on the signal of uniformed game wardens in contravention of 12 M.R.S.A. § 3051(2). His appeals from the ensuing judgments are denied.

The defendant charges error in the Court below in the admission at trial of certain real evidence which he claims was the fruit of an illegal search and seizure and in the instructions to the jury. He further contends that the evidence was insufficient to support the jury verdict of guilt in relation to the charge of failing to stop for the officers.

The record supports the following facts:

In the evening of November 24, 1973 and during the early morning hours of the

next day, Officers David O. Sewall and Gayland Brackett, two game wardens, while on duty and in uniform, were patrolling on the Gouldsboro Point Road in Gouldsboro for possible violations of our night hunting laws. The officers were checking several open fields containing apple trees, blueberry bushes and a "deer yard," which Warden Sewall referred to as "a place where deer congregate . . . especially in the winter time."

On November 25, 1973 at about 12:15 a.m. the two officers, from a vantage point on the west side of the main road, observed a vehicle approaching from a southerly direction at a very slow rate of speed. When it reached the intersection of an old camp road, it turned into it and stopped, illuminating in the process a portion of the field on the east side of the Gouldsboro Point Road. Returning to the main road, the automobile, while proceeding again in a northerly direction, made what one officer described as "jigging" movements which permitted an illumination of the rest of the open field.

Concluding that these activities constituted, or at least indicated, a violation of the hunting laws, the game wardens entered their patrol car, pulled onto the main road and started in pursuit of the suspect vehicle in an attempt to intercept it. When Officer Sewall put on the headlights of his car and the flashing blue light on the dash board, the other vehicle accelerated and a high speed chase ensued, but the game wardens were successful in overtaking the fleeing car and forcing it to stop at the intersection of Gouldsboro Point Road and U. S. Route # 1. This proved to be a very short intermission. Officer Sewall managed to get out, but as he reached the door on the driver's side of the car, the lone occupant of the blue Chevelle with white top swung into action, backed away and, avoiding the wardens' automobile,

speeded forward onto U. S. Route # 1. The chase was resumed reaching speeds in excess of 95 miles per hour according to Warden Sewall.

The defendant's racing skill was not to bring him a gold medal that day. Indeed, as he reached the intersection of the Chicken Mill Pond Road with U. S. Route # 1, due to the presence of a car coming from the opposite direction, he brought his car to an abrupt stop. The tailgating pursuers were not so fortunate and ran into the left rear of the Chevelle.

This time Warden Sewall was not to be denied. Proceeding to the driver's door of the disabled Chevelle, he placed the defendant driver under arrest for night hunting and ordered him to get out of the vehicle. When compliance to his order was not forthcoming, Warden Sewall forcibly removed him from the automobile.

Handcuffing the defendant, whom he identified at trial as Earle C. Cowperthwaite, Jr., Warden Sewall went back to the Chevelle with its door still open and, looking inside, observed a shot gun in the front seat leaning against the passenger door. He also noticed a hunting knife on the front seat and a loose shot gun cartridge and cartridge box on the floor of the wrecked car. He seized these materials.

I

The shot gun, hunting knife and ammunition were admitted into evidence at trial over the objection of the defendant's counsel. It is contended this was error on the ground that the seized items were products of an unreasonable warrantless search and seizure. The primary argument in this regard is that the search, in order to be sustained, must be justified as incident to a valid arrest for night hunting and that the arrest here was invalid.[1]

1. The defendant impliedly contends that the warden's statement to the effect that he was arresting the defendant for the specific offense of night hunting was binding for all

purposes. He contends, seemingly, that if the arrest cannot be justified on that specific ground, the search cannot be defended as an incident to a valid arrest. While we

■ While we, of course, agree with the basic contention that the propriety of a search incident to arrest is dependent upon the existence of a valid arrest (see e. g. *State v. Benoski,* 1971, Me., 281 A.2d 128, 133), that doctrine has no application to this case. The materials taken by the warden were not products of a search. The objects were in the open, and the observation by the officer of such materials exposed to general view did not constitute the type of intrusion which can be considered a search in the legal sense. *State v. Poulin,* 1970, Me., 268 A.2d 475, 480; *State v. Chapman,* 1969, Me., 250 A.2d 203, 206–207; *State v. MacKenzie,* 1965, 161 Me. 123, 137, 210 A.2d 24 and cases cited.

■ The testimony establishes that all of the evidence seized by the wardens was observed by Officer Sewall while standing at the open door of the disabled vehicle. The classical formulation of the "plain view doctrine," which we find applicable in the present case is found in *Harris v. United States,* 1968, 390 U.S. 234, 236, 88 S.Ct. 992, 993, 19 L.Ed.2d 1067, 1069.

"It has long been settled that objects falling in the plain view of an officer who has a right to be in the position to have that view are subject to seizure and may be introduced in evidence."

We believe, as we have already indicated, that the objects taken were in plain view. Cf. *State v. Stone,* 1972, Me., 294 A.2d 683, 688–689. We also believe that the warden had ample legal justification for being in a position to make the observation which led to the seizure of the evidence.

■ One of the factors which supplies such justification is the propriety of the arrest of the defendant. We recognize that a warrantless arrest for a misdemeanor is only proper, in the absence of broader statutory authorization, when the offense is committed in the arresting officer's presence. *Palmer v. Maine Central Railroad Company,* 1899, 92 Me. 399, 42 A. 800, 44 L.R.A. 673; *Caffinni v. Hermann,* 1914, 112 Me. 282, 91 A. 1009.

■ Both cases are distinguishable from the instant case. In *Palmer,* "[t]he plaintiff was not *found violating* any law of the state. The constable had no lawful authority to arrest him for a misdemeanor of which he was not guilty, *on information merely,* without a warrant" (the first emphasis in original—the second ours). In *Caffinni,* the only justification for the warrantless arrest was that the officers had been having trouble with offenders

hold that the seizure of the various evidentiary objects in this case was proper on grounds other than being incident to a valid arrest, we do note that some cases cast doubt upon the validity of the defendant's position. It has been stated that

"[t]he subjective state of the arresting officers' minds . . . is not the touchstone of the legality of the arrest because the proper standard is an objective one. Whenever the officers are in possession of an arrest warrant, they doubtless have in mind that they are making the arrest pursuant to that warrant; but the cases demonstate that even though a warrant may be held invalid by the court many months after the arrest, the Government may justify it by showing that at the time a lawful arrest could have been made without a warrant." *United States v. Russian,* 1961, D.C.Conn., 192 F.Supp. 183.

Accord: *United States v. O'Donnell,* 1962, D.C.Me., 209 F.Supp. 332.

In *State v. LeBlanc,* 1975, Me., 347 A.2d 590, at pp. 594, 595, we said:

"Detective McDowell testified that he examined the coat for the purpose of discovering some clue as to the defendant's identification. As previously noted, the police had probable cause to believe that the defendant had been interrupted in the process of committing a crime. The police had ample justification to place the defendant under arrest for burglary at that point . . . .

"Regardless of this officer's subjective purpose, a reasonable and prudent police officer in these circumstances would have been justified in searching the area within which this still unrestrained defendant might obtain a weapon or destroy evidence of the crime of which the police had probable cause to believe him guilty. However this officer articulated his purpose . . . ."

who brought liquors to Portland in suit cases and hand bags such as the plaintiff was carrying while traveling in an electric car from Old Orchard to Portland. The Court said:

"Testimony was offered by defendant, and excluded, relative to trouble which the enforcement officers had been having with those who violated the law by illegally transporting liquor in suit cases and hand bags; but *as there was no attempt to connect such acts with this plaintiff* there was no error in the ruling." (Emphasis added)

Here, the wardens observed the defendant in the performance of activities which could lead any ordinarily prudent and cautious officer of the law under the same circumstances to conclude that the offense of night hunting was being committed in their presence.

The circumstances upon which the wardens acted in formulating a belief there existed probable cause that the defendant was violating the hunting laws in their presence may be readily discerned from the following facts: 1) deer were known to the officers to congregate in the area, 2) apple trees on which deer feed were present, 3) it was nighttime, 4) the hunting season was in full swing, 5) the manner in which the car was being operated so that "deer yards" were illuminated, conduct generally recognized as consistent with violations of the hunting laws, and 6) the defendant's rapid exit at the approach of the officers in his attempt to escape.

True, the officers' factual observations did not include the actual physical sight of all the elements necessary to convict of the crime of night hunting. This, however, does not preclude the existence of probable cause to believe that the crime of night hunting was being committed in the presence of the officers.

As we did in *State v. Heald*, 1973, Me., 314 A.2d 820, at 824, 825, we again quote from *Brinegar v. United States*, 1949, 338 U.S. 160, 174, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879:

"In dealing with probable cause, however, as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. The standard of proof is accordingly correlative to what must be proved.

\*  \*  \*  \*  \*  \*

These long-prevailing standards seek to safeguard citizens from rash and unreasonable interferences with privacy and from unfounded charges of crime. They also seek to give fair leeway for enforcing the law in the community's protection. Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part. But the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability. The rule of probable cause is a practical, nontechnical conception affording the best compromise that has been found for accommodating these often opposing interests. Requiring more would unduly hamper law enforcement. To allow less would be to leave law-abiding citizens at the mercy of the officers' whim or caprice."

Game wardens are duty bound to enforce the inland fish and game laws pursuant to 12 M.R.S.A. § 2001 and in the enforcement of these laws they are authorized to arrest any violator thereof. 12 M.R.S.A. § 3052. Expressly vested under 12 M.R.S.A. § 2001 with the same powers and duties throughout the several counties of the State as sheriffs have in their respective counties, game wardens by such legislation are given the same powers and duties in the field of inland fish and game violations of law as the law confers upon sheriffs under 15 M.

R.S.A. § 704. Hence, the law mandates that game wardens "shall arrest and detain persons *found violating*" the inland fish and game laws "until a legal warrant can be obtained . . . ." (Emphasis provided)

The reference statute, thus, authorizes and mandates warrantless arrests of persons *found* by the officer violating the law. An arrest without a warrant may be justified under that statute, even though a misdemeanor offense only is involved, where the facts and circumstances within the officer's personal observation, as distinguished from information received from others, are sufficient in themselves to warrant a person of reasonable caution in the belief that the misdemeanor offense is being committed in his presence. *Commonwealth v. Presby*, 1859, 14 Gray (Mass.) 65; *Garske v. United States*, 1924, 8 Cir., 1 F.2d 620; *State v. Koil*, 1927, 103 W.Va. 19, 136 S.E. 510; *Ryan v. Conover*, 1938, 59 Ohio App. 361, 18 N.E.2d 277; *Cave v. Cooley*, 1944, 48 N.M. 478, 152 P. 2d 886; *State v. DelVecchio*, 1962, 149 Conn. 567, 182 A.2d 402; *State v. Smith*, 1962, 37 N.J. 481, 181 A.2d 761, cert. den. 374 U.S. 835, 83 S.Ct. 1879, 10 L.Ed.2d 1055; *People v. Dixon*, 1973, 45 Mich.App. 64, 205 N.W.2d 852. (But, see *Muniz v. Mehlman*, 1951, 327 Mass. 353, 99 N.E.2d 37; *Gill v. Montgomery Ward & Co., Inc.*, 1954, 284 App.Div. 36, 129 N.Y.S.2d 288).

In assessing whether the defendant was committing the offense of night hunting in their presence, the wardens not only could rely on the personal knowledge acquired through their senses, but also could take into consideration the reasonable inferences properly to be drawn from their visual observations. See *Commonwealth v. Kloch*, 1974, 230 Pa.Super. 563, 327 A.2d

375, 384; *State v. Reeder*, 1968, 183 Neb. 425, 160 N.W.2d 753.

Furthermore, the wardens could view the facts within their visual observation in the light of their experience as enforcers of the laws regulating inland fisheries and game, in determining whether a violation of law was being carried on at that particular time. See *Allen v. State*, 1962, 229 Md. 253, 182 A.2d 832.

Having observed facts which, in the light of his experience, gave him probable cause to believe that the crime of night hunting had been committed in his presence, Warden Sewall had lawful authority to arrest the defendant for such crime without a warrant pursuant to 15 M.R.S.A. § 704, made applicable through 12 M.R.S.A. § 2001. See *State v. Stone*, 1972, Me., 294 A.2d 683, 689. Since the defendant's arrest and removal from the car was under lawful authority, there is no question that Officer Sewall had a legal right to be in the position he was to make the observations of the interior of the automobile which led him to seize the instrumentalities of the crime which were in plain view.[2]

Even if the seized material had not been in plain view and even though the defendant had already been arrested and manacled, probable cause then existed to support a reasonable belief by an ordinary prudent and conscientious person that the automobile, which had been used in night hunting in the presence and to the personal knowledge of the wardens, probably contained instrumentalities with which such crime had been carried out. An immediate search of the car, under such circumstances, was constitutionally permissible on the ground of probable cause and within the requirements of exigent circumstances.

2. We need not consider the applicability and constitutionality of 12 M.R.S.A. § 3051(1) so far as the alleged search of the car is concerned. That statute provides: "Any officer authorized to enforce the provisions of chapters 301 to 355 [Inland Fish and Game], if in uniform and if he has reason to believe that a violation of any of such provisions has occurred or is taking place, may at any time stop any motor vehicle . . . for the purpose of arresting or questioning the operator or occupant thereof, or for the purpose of searching said motor vehicle . . . ."

See *State v. Cress*, 1975, Me., 344 A.2d 57, 64.

## II

The defendant next contends that the presiding Justice's instructions to the jury respecting the concept of "reasonable doubt" was misleading. His specific objection was directed to the Court's use of the following example in illustrating the meaning of the term "reasonable inference:"

"[I]f your next door neighbors have been away and on a particular evening you see lights on, and smoke coming out of the chimney, a reasonable inference is that they've returned. Now, other explanations are possible, but that's in the realm of what we refer to as a reasonable inference."

The defendant argues that the only reasonable inference to be drawn from the example use by the Court would be "that someone was in the house," and that the Court should have instructed the jury with respect to such circumstantial evidence that they must eliminate all other reasonable hypotheses before proof beyond a reasonable doubt could be sustained. He complains that other reasonable inferences may be drawn from the hypothetical illustration given to the jury.

We indicated in *State v. Pike*, 1973, Me., 306 A.2d 145, 150

"that the refusal of a presiding Justice to focus upon circumstantial evidence as uniquely subject to a 'negative-exclusion' evaluation may well be an avoidance, rather than the commission, of reversible error."

■ The standard for proof of guilt beyond a reasonable doubt applies equally to direct and circumstantial evidence. Respecting either type of evidence, the jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference. In both cases, it is a question for jury evaluation of the probabilities. It is improper to single out circumstantial evidence for the application of a different test in relation to proof beyond a reasonable doubt from that applicable to all other evidence.

As stated in *Holland v. United States,* 1954, 348 U.S. 121, 139–140, 75 S.Ct. 127, 137, 99 L.Ed. 150, 166:

"[T]he better rule is that where the jury is properly instructed on the standards for reasonable doubt, such an additional instruction [as the negative-exclusion test] on circumstantial evidence is confusing and incorrect."

■ The presiding Justice expressly stated to the jury that no higher priority is assigned to one type of evidence than the other and that whatever may be the type of evidence for their consideration, proof of the accused's guilt must be established beyond a reasonable doubt. The Court did not commit error in refusing to give to the jury the "negative-exclusion" test in relation to circumstantial evidence as requested by the defendant.

## III

■ Finally, the defendant claims that the evidence was insufficient to prove beyond a reasonable doubt that he had knowledge that his pursuers on the night of the arrest were uniformed officers as required by 12 M.R.S.A. § 3051(2). An examination of the trial proceedings reveals this contention to be totally meritless.

The evidence clearly showed that, during the chase which preceded the defendant's arrest, the wardens were at one point able to force his vehicle to a stop. When this occurred, both officers, who were in uniform, exited from their patrol car and ap-

proached the defendant's automobile the headlights of which were on. As Officer Sewall reached the door on the driver's side of the car, the defendant fled. There was also evidence that, in the course of the pursuit, the warden's vehicle signaled with a flashing blue light.

Taken together, the above facts provide ample circumstantial justification for the jury's finding that the defendant was guilty of *knowingly* failing to stop his motor vehicle upon signal of a fish and game officer in uniform.

The entry will be

Appeals denied.

DELAHANTY, J., sat at argument but did not participate in the decision.

All Justices concurring.