Commonwealth *v.* Kloch, Appellant.

Argued March 11, 1974.   Before WATKINS, P. J., JACOBS, HOFFMAN, CERCONE, PRICE, VAN DER VOORT, and SPAETH, JJ.

*Kenneth E. Hankins, Jr.,* with him *Thomas H. Cri-der, Blake E. Martin,* and *Crider, Martin, Bittle & Hankins,* for appellant.

*Edwin D. Strite, Jr.,* First Assistant District Attorney, with him *John W. Walker,* District Attorney, for Commonwealth, appellee.

OPINION BY SPAETH, J., September 23, 1974:

Appellant was convicted by a jury of operating a motor vehicle while under the influence of intoxicating liquor. The Vehicle Code, Act of April 29, 1959, P. L. 58, §1037, 75 P.S. §1037. On this appeal he raises numerous issues. After review of each issue we affirm.

A summary of the events surrounding appellant's arrest is essential to discussion of the issues he raises.[1] On January 29, 1971, shortly before 3:00 a.m., State Troopers Michael Belkelja and S. A. Bowser, who were assigned to the Chambersburg substation, received a dispatch over the radio that a motor vehicle was parked on the highway approximately two miles north of Chambersburg. Upon arriving at the scene the troopers found a 1970 Dodge coupe illegally parked[2] in the southbound lane with three quarters of the car on the

---

[1] What follows is a synopsis of the trial testimony of the two arresting officers and a fellow officer who observed appellant after the arrest. Some of the facts are stated in Judge HOFFMAN's opinion in *Commonwealth v. Kloch,* 221 Pa. Superior Ct. 324, 292 A.2d 479 (1972).

[2] *See* The Vehicle Code, *supra* §1021, Act of July 13, 1959, P. L. 529, §1; Act of July 14, 1961, P. L. 616, §2; Act of November 10, 1965, P. L. 839, §2, 75 P.S. §1021.

roadway and the remainder on the shoulder of the road. The car's motor was running, the lights were on and the windows were shut. Appellant was seated in the driver's seat, slumped against the left door, apparently asleep. Trooper Belkelja awakened appellant by tapping on the door window and shouting. After appellant rolled down the window the troopers smelled a strong odor of alcohol. Belkelja asked appellant what he was doing there; appellant replied that he had pulled over to sleep. Appellant was then asked to produce his operator's license and car registration. He had difficulty doing so. When appellant got out of the vehicle he was able to stand but did so by leaning against the vehicle. After appellant alighted it became apparent to the troopers that the odor of alcohol was coming from appellant. Appellant was instructed to walk toward Belkelja, who was standing by the patrol car, parked behind appellant's car. This request, which is known as "a field sobriety test," was made to enable the troopers to determine if appellant was drunk. As appellant walked toward Belkelja he staggered and at one point had to be supported by Trooper Bowser. The troopers then put appellant in the back seat of the patrol car, read him the warnings required by *Miranda v. Arizona*, 384 U.S. 436 (1966), and advised him that he was under arrest for operating a vehicle while intoxicated. After driving appellant's car to a safe place off the highway Belkelja asked appellant how much he had had to drink. Appellant said he had had a few drinks with friends at the officers' club at the Letterkenny Army Depot, which is about a mile from where appellant's car was found. Appellant was taken to the Chambersburg substation where he was given a blood test by a qualified physician. While there he was observed by Trooper Edward Miller, Jr., to be glassy-eyed. Miller also saw him staggering, and found his speech slurred.

On April 20, 1971, after a preliminary hearing, appellant was bound over for action by the grand jury. On August 13 the grand jury approved the indictment. On August 20 appellant presented a pre-trial motion to suppress evidence. As to most of the evidence the motion was denied. The court below, however, did order the results of the blood test suppressed. The Commonwealth appealed to this court, and on June 16, 1972, the appeal was quashed.[3]

On August 18, 1972, appellant presented applications for dismissal, to quash the indictment, for change of venue, challenging the array of the grand jury, and challenging the array of trial jurors. The applications were dismissed and on August 31 and September 1 the case was tried before a jury.

On August 2, 1973, appellant's post-trial motions were heard by a court en banc. By opinion and order of October 18 the motions were dismissed.

## I.

Appellant contends that his first statement to Trooper Belkelja, that he had pulled over to sleep, should have been suppressed because no *Miranda* warnings had been given him.

Under *Miranda v. Arizona, supra,* a person must be warned of his right to remain silent before the initiation of custodial interrogation. "Custodial interrogation" encompasses questioning conducted (1) "after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way," *id.* at 444, or (2) while he is the focus of an investigation, *Commonwealth v. Feldman,* 432 Pa. 428, 432, 248

---

[3] The Commonwealth did not state that "it would be substantially handicapped or concluded by the inadmissibility of the suppressed evidence." *Commonwealth v. Kloch, supra* at 327, 292 A.2d at 480.

A.2d 1, 3 (1968). Warnings are not required where general on-the-scene investigatory questioning is conducted "to determine whether a crime has been committed or is in progress." *Lowe v. United States*, 407 F.2d 1391, 1394 (9th Cir. 1969).[4] Such questioning is not considered "custodial." Belsky, Criminal Procedure in Pennsylvania: The Pre-Trial Issues in Four Parts, 78 Dick. L. Rev. 209, 214 (1974). This is made explicitly clear in *Miranda*: "General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding. It is an act of responsible citizenship for individuals to give whatever information they may have to aid in law enforcement. In such situations the compelling atmosphere inherent in the process of in-custody interrogation is not necessarily present (footnote omitted)." *Miranda v. Arizona, supra* at 477-78.

When these principles are applied to the present case it will be seen that Trooper Belkelja's initial question to appellant, in which he asked why appellant was illegally parked, was not "custodial interrogation" but rather "[g]eneral on-the-scene questioning." It is true that when the troopers walked up to appellant's car they intended to restrict his freedom of movement, but not in any significant way.[5] Appellant was after all illegally

---

[4] It should be noted that *Miranda*, in permitting general on-the-scene questioning without warnings, complements *Terry v. Ohio*, 392 U.S. 1 (1968), discussed *infra* at 573-74. "It is difficult to conceive how a policeman [could] avail himself of the [procedure] outlined in Terry v. Ohio, unless he is able to ask questions of the person he has stopped." *Lowe v. United States, supra* at 1394.

[5] In some jurisdictions, officers are not required to give *Miranda* warnings to drivers stopped for minor traffic offenses for which tickets are issued. *See, e.g., State v. Tellez*, 6 Ariz. App. 251, 431 P.2d 691, 25 A.L.R. 3d 1063 (1967). Appellant does not claim, and we therefore do not decide, that a driver is entitled to warnings when his detention depends solely upon his being illegally parked.

parked and had to be detained if a ticket was to be issued. Nor was the investigatory nature of the situation altered by the fact that when appellant rolled down the car window the troopers smelled alcohol. Belkelja's question was designed to determine how appellant's car came to be where it was. The question related as much to the fact that appellant was illegally parked as to the suspicious circumstances. It was not accusatory, nor was it necessarily intended to elicit a confession of drunk driving. Appellant points to nothing suggesting that the question was asked under circumstances that were hostile or coercive. When the question was asked, appellant was still in his own car. Under these facts Belkelja's questioning cannot be considered "custodial interrogation." *See State v. Dubany,* 184 Neb. 337, 167 N.W. 2d 556 (1969) (pickup stuck in sand, driver asked if he had been driving). *See also* Annot., 25 A.L.R. 3d 1076-1086 (1969). Accordingly, appellant's answer to the question was properly admitted despite the fact that he had been given no *Miranda* warnings.

Appellant also contends that *Miranda* warnings should have been given before the troopers asked him to take the field sobriety test. The contention has no merit. *Miranda* warnings are required by the Fifth Amendment; they inform a person that he cannot be compelled to be a witness against himself. Requiring a driver to walk in an effort to determine whether he is intoxicated does not violate his privilege against self-incrimination, for the evidence secured is not of a "testimonial or communicative nature." *Schmerber v. California,* 384 U.S. 757, 761 (1966). Rather, the driver is the source of "real or physical evidence," compulsion of which does not come within the purview of the Fifth Amendment. *Id.* at 763-64. *See generally Commonwealth v. Robinson,* 229 Pa. Superior Ct. 131, 324 A.2d 441 (1974). *Cf. Commonwealth v. Rutan,* 229 Pa. Superior Ct. 400, 323 A.2d 730 (1974).

## II.

Appellant next contends that he was under arrest for drunk driving from the moment the troopers smelled alcohol, after he had rolled down his window; that the arrest was illegal as a warrantless arrest; and that his statements to the troopers, the results of the field sobriety test, and the observations of him by Trooper Miller, should have been suppressed as the fruits of the arrest.

"An arrest may be accomplished by 'any act that indicates an intention to take [a person] into custody and that subjects him to the actual control and will of the person making the arrest:' 5 Am. Jur. 2d, Arrest, §1, p. 695." *Commonwealth v. Bosurgi*, 411 Pa. 56, 68, 190 A.2d 304, 311 (1963). Appellant was not arrested until he was placed in the troopers' patrol car. Prior to that time the troopers did nothing that subjected appellant to their control and will or indicated an intent to take appellant into custody. Rather, the troopers engaged in a course designed to determine whether there was a basis for holding appellant.

It is true that appellant was not entirely free to leave before he was placed in the patrol car. As has been stated, the troopers intended to detain appellant at the time they walked up to his car. Their intention, however, arose from the fact that appellant was illegally parked. The odor of alcohol aroused their suspicions and gave them further cause for a brief detention of appellant. Brief detentions for investigatory purposes are constitutionally permissible where probable cause for a lawful arrest is lacking. Under *Terry v. Ohio, supra,* a police officer may stop a person if he observes specific instances of unusual and suspicious conduct on the part of the person that reasonably leads him to conclude that criminal activity is afoot. *See Commonwealth v. Hicks,* 434 Pa. 153, 158 and 160-1,

253 A.2d 276, 279 (1969). In this case the troopers observed appellant asleep behind the wheel of an illegally parked car. When he opened the car window they smelled alcohol. These facts support a finding that the troopers' decision to detain appellant for brief investigatory purposes was lawful under *Terry*. The investigatory purpose of Trooper Belkelja's question concerning how appellant's vehicle came to be parked on the highway has already been discussed; *see* footnote 4, *supra;* no more need be said. It is clear that the question must be considered a product of the lawful *Terry* stop. The same is true of the field sobriety test. The test was conducted to obtain information as to whether appellant was intoxicated. Although appellant was no longer seated in his own vehicle, the troopers did nothing in conducting the test that subjected appellant to their control. Trooper Bowser did at one point support appellant, who was unsteady on his feet, but this assistance was not offered in order to control appellant.

Having fixed the point at which appellant was arrested, *i.e.,* when he was placed in the patrol car, we must now decide whether that arrest, which was warrantless, was legal. We have concluded it was. Accordingly, the evidence acquired after the arrest—appellant's statement concerning the number of drinks he had had and the observations of Trooper Miller—were properly admitted.

One who "operate[s] a motor vehicle . . . while under the influence of intoxicating liquor" commits a misdemeanor. The Vehicle Code, *supra* §1037, 75 P.S. §1037. "A police officer may only make a warrantless arrest for a misdemeanor 'where he has probable cause to believe that a misdemeanor *is being committed in his presence.*' Commonwealth v. Vassiljev, 218 Pa. Superior Ct. 215, 219-220, 275 A.2d 852 (1971) (emphasis added)." *Commonwealth v. Reeves,* 223 Pa. Supe-

rior Ct. 51, 52-53, 297 A.2d 142, 143 (1972). *See also* The Vehicle Code, *supra* §1204, 75 P.S. §1204 (warrantless arrests can be made "upon view"). "Probable cause" means that the officer has "knowledge of sufficient facts and circumstances, gained through trustworthy information, to warrant a prudent man in [his] belief." *See Commonwealth v. Hicks*, 434 Pa. 153, 158, 253 A.2d 276, 279 (1969). The evidence is undisputed that when appellant rolled down the window the troopers smelled a strong odor of alcohol and therefore had reason to suppose that appellant was under the influence of intoxicating liquor. The only question, therefore, is whether they had probable cause to believe that he was "operating" his car.[6]

In *Commonwealth v. Kallus*, 212 Pa. Superior Ct. 504, 243 A.2d 483 (1968), this court considered the definition of "operation" as used in The Vehicle Code, *supra* §1037, 75 P.S. §1037. The defendant in *Kallus* was found sitting in the driver's seat of a car whose wheels were spinning. Several people were trying to push the car onto the road but it was imbedded in a snowbank and could not be moved. In holding that the defendant was nonetheless operating the car this court said:

"[I]t is not necessary that the vehicle itself must be in motion . . . [;] it is sufficient if the operator is in actual physical control of the movements of either the machinery of the motor vehicle or of the management of the movement of the vehicle itself.

"There is no doubt, in the present case, that the engine was running and that the car was in gear and

---

[6] It should be clear that in determining whether appellant's arrest was legal we cannot consider his statement that he pulled his car over in order to sleep, for the statement is not pertinent to the question of whether the troopers saw appellant operating his car. *See Commonwealth v. Jacoby*, 226 Pa. Superior Ct. 19, 311 A.2d 666 (1973).

thus the defendant was in actual physical control of the machinery of the vehicle. It was through no fault of his that the vehicle itself was not also in motion and had he succeeded in his efforts, the public safety, which the Act was intended to protect, could have been seriously jeopardized." *Id.* at 507-08, 243 A.2d at 485. From this it is clear that "operation" depends upon "actual physical control." *See* The Vehicle Code, *supra* §102, 75 P.S. §102 ("operator" is defined as a person in "actual physical control" of a motor vehicle "upon the highway").

A driver has "actual physical control" of his car when he has real (not hypothetical), bodily restraining or directing influence over, or domination and regulation of, its movement or machinery. Webster's Third New International Dictionary 22, 1706 and 496-97 (1961). *See State v. Ruona,* 133 Mont. 243, 248, 321 P.2d 615, 618 (1958). *See generally,* Annot., 47 A.L.R. 2d 570 (1956).

It is not dispositive that appellant's car was not moving, and that appellant was not making an effort to move it, when the troopers arrived. A driver may be in "actual physical control" of his car and therefore "operating" it while it is parked or merely standing still "so long as [the driver is] keeping the car in restraint or in position to regulate its movements. Preventing a car from moving is as much control and dominion as actually putting the car in motion on the highway. Could one exercise any more regulation over a thing, while bodily present, than prevention of movement or curbing movement." *State v. Ruona, supra* at 248, 321 P.2d at 618. *And see* Annot., 47 A.L.R. 2d *supra* at 571-72, noting that sometimes a distinction is drawn between a statute prohibiting "driving," as compared to a statute prohibiting "operating," a motor vehicle while under the influence of intoxicating liquor, it being "held that to be guilty of driving a vehicle while

intoxicated, the defendant must have had the vehicle in motion. [Footnote omitted.]"

Neither is it dispositive that appellant was asleep when the troopers arrived. *State v. Webb,* 78 Ariz. 8, 274 P.2d 338 (1954), is very similar to the present case. There the statute forbids one "to drive or be in actual physical control of any vehicle" while under the influence of intoxicating liquor. The defendant was found at 2:00 A.M., drunk and asleep with his head and arms on the steering wheel of his truck, which was parked in a lane of traffic with its lights on and motor running. In holding that these facts showed a violation of the statute the court said: "An intoxicated person seated behind the steering wheel of a motor vehicle is a threat to the safety and welfare of the public. The danger is less than that involved when the vehicle is actually moving, but it does exist. While at the precise moment defendant was apprehended he may have been exercising no conscious volition with regard to the vehicle, still there is a legitimate inference to be drawn that defendant had of his own choice placed himself behind the wheel thereof, and had either started the motor or permitted it to run. He therefore had the 'actual physical control' of that vehicle, even though the manner in which such control was exercised resulted in the vehicle's remaining motionless at the time of his apprehension." *Id.* at 11, 274 P.2d at 340.

*State v. Ruona, supra,* is in accord. There at about 3:00 A.M. a deputy sheriff found the defendant, under the influence of intoxicating liquor, slumped over the wheel of his car, parked partly in a traffic lane and with its motor running. The sheriff shook the defendant three or four times, but the defendant "just mumbled." After unsuccessfully trying to cajole the defendant from the car, the sheriff arrested him. The defendant tried to drive away, "and in fact the car lurched backwards three or four feet," *id.* at 245, 321 P.2d at

616, whereupon the sheriff grabbed his arm and prevented him from going farther. It might seem that this case is distinguishable in that the defendant did move his car, but that is not so. The arrest was before the movement, and the fact of the movement was irrelevant to the holding. The issue was the correctness of the lower court's instruction to the jury "[t]hat it need not be shown that the vehicle had actually moved or was traveling . . . ." *Id.* at 247, 321 P.2d at 617. In upholding this instruction the Supreme Court of Montana cited and followed *State v. Webb, supra,* which it described as "[t]he leading case." *Id.* at 249, 321 P.2d 618.

The annotation in 47 A.L.R. 2d, *supra,* cites *State v. Wilgus,* 31 Ohio Ops. 443 (1945). This was a decision by a court of common pleas; it is to the same effect as *Webb* and *Ruona* and is cited in both of those decisions with approval. The annotation also cites English and Canadian decisions, but these involve different statutory language, *e.g.,* "in charge of" the vehicle, and so are not quite so helpful. A useful contrasting decision cited in the annotation is *Commonwealth v. Fox,* 17 Pa. D. & C. 491 (Ct. of Q.S. Lancaster Co. 1932). The defendant, in an intoxicated condition, was a passenger in the car. The car broke down and the driver left. The defendant then tried to drive it but was unable to move it because the drive shaft was broken. The decision that he was not in "actual physical control" of the car and so was not the "operator" of it is consistent both with our decision in *Commonwealth v. Kallus, supra,* and with *State v. Ruona, supra,* and *State v. Webb, supra.*

In the present case appellant was seated behind the wheel, there was a strong odor of alcohol, the car was parked mostly on the highway, the motor was running, and the lights were on. In assessing whether appellant was operating the car while under the influence of in-

toxicating liquor, *i.e.*, was committing a crime in their presence, the troopers could rely not only on the "personal knowledge acquired at the time through his senses" but also on "inferences properly drawn from the testimony of his senses." *Davids v. State,* 208 Md. 377, 384, 118 A.2d 636, 638 (1955). From what they saw the troopers could reasonably infer that appellant had driven to the spot where they found his car, stopped there without pulling completely off the highway, left the motor running to provide some warmth, left the lights on to provide some safety and then had fallen asleep. In short, they could reasonably infer that the car was where it was and was performing as it was because of appellant's choice, from which it followed that appellant was in "actual physical control" of and so was "operating" the car while he slept.

It is true that the troopers might have drawn other inferences from the information they had. They might have inferred that some third person had driven the car to the spot where they found it, stopped without pulling the car off the highway, and left the scene without turning the motor and lights off. They might further have inferred that appellant had been asleep and had slumped behind the wheel after the third person had left. In such event it could not be said that appellant had actual physical control of the car. The likelihood of these possibilities, however, was not great. There was no evidence that someone other than appellant was the driver. The probability was that appellant had driven the car to the scene and that the car when found was performing pursuant to his wishes. That probability was all the troopers needed in order to make a legal arrest. "It is only the probability, and not a prima facie showing, of criminal activity that is the standard of probable cause. Beck v. Ohio, 379 U.S. 89, 85 S. Ct. 223 (1964). [Footnote omitted.]" *Common-*

*wealth v. Marino,* 435 Pa. 245, 253, 255 A.2d 911, 916 (1969).

### III.

As noted above, upon appellant's motion the results of the blood test given shortly after his arrest were suppressed. Included in the suppression order was a directive requiring the court clerk to impound papers pertinent to appellant's motion and prohibiting the clerk from disclosing the nature and purpose of the suppression hearing.

Following the suppression hearing several newspaper articles about appellant's case appeared in The Public Opinion. The record does not disclose exactly where The Public Opinion circulates nor the number of its readers. It appears that appellant's case was of interest because a short time before his arrest appellant, who is an attorney, was hired on a trial basis as a part-time investigator for the Franklin County Public Defender's Office. On September 8, 1971, it was reported at the end of an article concerning criminal proceedings involving others that the charges against appellant had been dropped because of insufficient evidence. The next day the paper carried an article headlined, "Kloch Case Still Active." The article quoted the District Attorney as saying, "The case is still active—there was a suppression hearing [.] . . . As a result we did not call it to trial. We are considering appealing this decision." On September 29, 1971, it was reported that the Commonwealth would appeal the suppression order. The next article was on February 23, 1972, by way of an answer to a reader's letter. The paper printed a chronology of the events in appellant's case. Included was the following item: "Aug. 27, suppression hearing held. Judge John W. Keller ruled that the result of blood test in case be suppressed as evidence improperly ob-

tained." At the end of the article it was reported that "[h]earings on suppression of evidence are held before many court cases go to trial, but under state law, to protect the rights of defendants to a fair trial, the fact that these hearings are held and their results are not permitted to be revealed before completion of the case in courts." On June 16, 1972, this court quashed the Commonwealth's appeal. *See* footnote 3, *supra.* This decision was briefly reported in an article of July 29, 1972.

Because of the articles in The Public Opinion appellant filed applications to have the indictment against him quashed or in the alternative for a change of venue. At the hearing on the applications one of the witnesses was the man who had been district attorney at the time the first and second articles appeared. He testified that he had disclosed to a reporter of The Public Opinion that evidence had been suppressed, but he denied that he had revealed the nature of that evidence, *i.e.*, blood test results. The reporter who wrote the articles testified that the specific nature of the evidence was probably obtained from court records. The clerk of the court testified that the suppression order had been inadvertently entered on court records available to the public, and that the papers pertinent to appellant's motion to suppress had not been impounded. Despite this evidence the hearing judge denied appellant's request for relief. He ruled that it did not appear that appellant had been prejudiced by the violation of the impoundment order or by the publicity from the articles. Furthermore, he concluded, appellant's right to a fair trial could be adequately protected by voir dire examination of prospective jurors.

It would have been wiser and more professional of the district attorney not to indicate to the reporter from The Public Opinion that a suppression hearing had been held and evidence suppressed. Neither the fact

that a hearing had been held nor the order was (or should have been, rather) a matter of record. Publicity concerning the hearing and order even if not specific might hurt appellant's chances of receiving a fair trial. *See* ABA Standards Relating to Fair Trial and Free Press §1.1, p. 2. Given his indiscretion, however, it is understandable that when the paper erroneously reported that the proceeding had been dropped because of insufficient evidence, the district attorney felt obliged to correct the error by saying that the suppression order would be appealed. In making this statement he did not reveal the nature of the evidence suppressed, and he cannot be held accountable for the report that the evidence was the results of a blood test. Since this information was evidently taken from the court's records, appellant's principal complaint is against the newspaper reporter who took the information from the records, which is to say, against the clerk of court for his violation of the impoundment order.

The impoundment order was issued pursuant to Pa. R. Crim. P. 323(g), which provides: "A record shall be made of all evidence adduced at the hearing [on defendant's motion to suppress]. The clerk of court shall impound the record and the nature and purpose of the hearing and the order disposing of the application shall not be disclosed by anyone to anyone except to the defendant and counsel for the parties. The record shall remain thus impounded unless the interests of justice require its disclosure."

In *Commonwealth v. Ravenell*, 448 Pa. 162, 173, 292 A.2d 365, 371 (1972), the Supreme Court stated that "[t]he purpose of section (g) of Rule 323 is to protect a defendant's Fifth Amendment privilege against self-incrimination. It is felt that an individual who is seeking to suppress evidence has the fullest opportunity to testify at the hearing when he knows that his testimony will not be disclosed." It is, nevertheless, by no means

clear that this is the only purpose of the rule. Impoundment of the results of a suppression hearing prevents dissemination of information that would not be admissible at trial. Such dissemination if made by the news media, as in the case, might reach potential jurors and make it impossible for a defendant to receive a fair trial. Thus the rule, in effect if not in intent, serves to assure fair trials untainted by pre-trial publicity.

There is no doubt that the rule was violated here. However, the evidence does not establish that appellant was prejudiced by the violation. We cannot say that appellant was denied a fair trial by an impartial jury by reason of the publication of articles containing impounded information. In making this determination we have considered as best we can such facts as are relevant when the inquiry concerns prejudice resulting from pre-trial publicity. *See Commonwealth v. Jones,* 452 Pa. 299, 304 A.2d 684 (1973) ; *Commonwealth v. Pierce,* 451 Pa. 190, 303 A.2d 209, *cert. denied,* 414 U.S. 878 (1973) ; *Commonwealth v. Hoss,* 445 Pa. 98, 283 A.2d 58 (1971) ; *Commonwealth v. Palmer,* 225 Pa. Superior Ct. 370, 310 A.2d 360 (1973). *See generally* 33 A.L.R. 3d 17 (1970). Appellant does not allege, nor is it shown, that any of the persons who served as jurors in his case in fact had knowledge of the articles containing the impounded information.[7] It therefore cannot

---

[7] Appellant's counsel stated before the jury was selected that in his opinion a voir dire examination on pre-trial publicity would be ineffective and would cause further prejudice to appellant. He therefore declined to engage in such examination. Perhaps counsel was correct. He might, however, have requested individual voir dire, and the examination might have been opened in a very general way, as for example, "Do you know anything about this case?" Most trial judges have had the experience of prospective jurors replying that yes, they had read something or other about the case but did not recall what it was. A defendant's apprehensions that everyone knows about his case are quite often exaggerated. In any case,

be said that appellant suffered actual prejudice as a result of the articles. Nor can we conclude that the articles were inherently prejudicial. While appellant's position as part-time investigator for the Public Defender may have caused readers of The Public Opinion to be more interested in his case than they would be in the ordinary drunk driving case, there is no claim or showing that that interest was more than casual. It does not appear that the community was agitated over appellant's case. The articles themselves were short. The record does not indicate on what pages the articles appeared or where on those pages. They appeared over a period of about a year, the last one thirty-three days before trial. The material contained in the articles was factual. They did not contain interpretations or speculations concerning the order or its validity. The articles were not editorials, nor did they contain expressions of opinion as to appellant's guilt.[8] Only two of the articles stated that the suppressed evidence was blood test results. In one of these there was a statement that the reason the results of a suppression hearing are not revealed is "to protect the rights of defendants to a fair trial." It is regrettable that having recognized this fact the paper nevertheless ignored it. How-

---

whether as a matter of tactics correct or not, counsel's decision has left us with a meager record.

[8] The February 23, 1972, article included this:

"[I]n the Kloch case, the then District Attorney Benedict broke the court-imposed secrecy on the suppression hearing in his comments to the press September 9. A person who breaks this rule is liable to contempt of court charges.

"Both Martin and Benedict said it is the first time they have heard of the local District Attorney's office appealing a court decision." Perhaps this is speculative or argumentative; a suspicious reader might decide something slightly sinister was going on. However, another reader might feel antagonism to the district attorney and sympathy to the person whose rights had apparently been ignored.

ever, the explanation might have reduced the impact of the specific information the article contained. The second article reported our decision in *Commonwealth v. Kloch, supra,* but that was a matter of public record.

## IV.

Appellant made timely objections to the exclusion of doctors and lawyers from the array of prospective jurors from which a petit jury would be drawn in his case. At a pretrial hearing a Franklin County jury commissioner confirmed the fact that doctors and lawyers were systemically excluded from the jury wheel. The hearing judge nevertheless dismissed appellant's objections.

Appellant argues that this ruling was erroneous for two reasons: first, that the jury commissioners of Franklin County are required by statute to select prospective jurors "from the whole qualified electors . . . of sober, intelligent and judicious persons," Act of April 10, 1867, P. L. 62, §2, 17 P.S. §942, and that since doctors and lawyers are as "qualified" as other electors they should not have been excluded, and second, that as a matter of equal protection he was entitled to select jurors from an array representative of a cross section of the entire community. It will be convenient to discuss appellant's constitutional claim first.

Because doctors and lawyers do not constitute a group characterized by a common race, nationality or religion, and because they are not members of a class that is the subject of general discrimination, there need only be a "reasonable basis" for their exclusion from jury service. *Williams v. State,* 285 So. 2d 13 (Fla. 1973). There is a reasonable basis to exclude doctors "because the good of the community is promoted by the uninterrupted continuation of their regular duties." *Commonwealth v. Kopitsko,* 177 Pa. Superior Ct. 161,

163, 110 A.2d 745, 746 (1955). *See also Labat v. Bennett*, 365 F.2d 698, 720 (5th Cir. 1966); *Rawlins v. Georgia*, 201 U.S. 638 (1906). The same may be said of lawyers to some extent. More important, however, lawyers because of their training possess the potential of being overly influential in a jury's deliberations. In addition, they are more likely than ordinary citizens to know the attorneys involved in a case and to be familiar with their professional reputations. This is especially true in an area where the bar is small. Even if these factors are discounted, and granting that lawyers may be as objective and impartial as any other juror, nevertheless confidence in the integrity of the jury system is better maintained if lawyers are excluded from service. It is a common misconception that most lawyers regularly appear in the courts and are therefore "insiders" in the judicial system. Insiders should not serve on juries. As stated in *Harrison v. State*, 231 Ind. 147, 158, 106 N.E. 2d 912, 919, 32 A.L.R. 2d 875, 884 (1952): "[a]n attorney at law is an officer of the Court [citations omitted], and as such he is interested in and is an integral part of the judicial machinery which administers justice." "While attorneys at law are not public officials such as sheriffs, prosecutors and police officers, they are so much a part of the court in which cases are to be tried that they may justifiably be excluded upon the same ground as police officers, or any other person who might have a public interest in the case." *Id.* at 160, 106 N.E. 2d at 919-20, 32 A.L.R. 2d at 885.

With respect to appellant's statutory argument, we have no doubt that consistent with the statutory provision on which appellant relies the jury commissioners of Franklin County have some discretion in determining who is qualified to serve as a juror and who should be exempted or excepted from service. In *Grove v. Toninecz*, 189 Pa. Superior Ct. 32, 42, 149 A.2d 547, 552 (1959), this court, relying on *Commonwealth v. Zilla-*

*frow*, 207 Pa. 274, 56 A. 539 (1903), stated that "[t]he provision of the 1867 Act which requires that jurors shall be selected from the 'whole qualified electors' of the county . . . is directory only." *See generally* Comment, The Key-Man System of State Jury Selection as a Source of Violation of the Fourteenth Amendment, 77 Dick. L. Rev. 117, 118-22 (1972). To be sure, the jury commissioners do not have unlimited discretion; they cannot act to contravene the Act's "spirit or intent." *Commonwealth v. Zillafrow, supra* at 277, 56 A. at 540.[9] However, there is no suggestion of such conduct. Appellant does not claim that the exclusion of doctors and lawyers caused a substantial or identifiable social or economic class to be unrepresented in the array, nor that as a result of the exclusion those who were included in the array were unqualified to serve; nor does appellant ascribe to the commissioners improper motives or a discriminatory intent. As noted in our discussion of appellant's equal protection claim, by excluding doctors and lawyers from the array the commissioners acted in the best interests of the community and judicial system. Their action therefore cannot be considered inconsistent with the spirit or intent

---

[9] There are statutorily proscribed qualifications, exemptions or exceptions that limit the discretion of jury commissioners in first-class counties, Act of May 10, 1949, P. L. 1066, §2, 17 P.S. §1252(c) ; second-class counties alone, Act of December 6, 1972, P. L. 1376, No. 292, §6 and §12, 17 P.S. §1301.5 and §1301.11; second- and second-class A counties, Act of May 11, 1925, P. L. 561, §9, Act of April 7, 1927, P. L. 172, §1, as amended, Act of June 16, 1972, P. L. 424, No. 123, §1, 17 P.S. §1279; second A and third-class counties, Act of May 17, 1939, P. L. 157, §2, as amended, Act of May 11, 1973, No. 12, §1, 17 P.S. §1333. Franklin County is a county of the fourth-class; such specific proscriptions do not apply to it. Act of August 9, 1955, P. L. 323, §210, as amended, Act of October 20, 1967, P. L. 470, No. 223, §1, Act of September 9, 1971, P. L. 458, No. 107, §1, 16 P.S. §210.

of the requirement that jurors be selected from the "whole qualified electors."[10]

## V.

During the district attorney's closing argument the following discussion occurred out of the hearing of the jury: "MR. CRIDER [appellant's counsel]: Mr. Martin [appellant's other counsel] has asked me to object to that part of the District Attorney's charge in which at one time he said this evidence was uncontradicted, although he corrected his statement then, he added, 'if there was any other way to get there, it wasn't shown.' That is an indication that the defendant has a duty to show, and I think there is a suggestion in that remark that the defendant has a duty to show—THE COURT: It is the Court's understanding from defense counsel's closing argument that there are other ways the defendant could have gotten to the place where the defendant was found, and that the Commonwealth's argument was simply by way of answering the same. MR. CRIDER: 'If there were such ways, they weren't shown to us.' That leaves an indication. MR. MARTIN: It is a comment on the defendant's right not to take the stand, and we move for a mistrial. THE COURT: Motion denied. The Court does intend to charge the jury on the absolute right of the defendant to not take the stand. MR. MARTIN: We take an exception. THE COURT: The District Attorney's recollection of the statement is—? MR. STRITE [the District Attorney]: I said that defense counsel said there were other ways for the defendant's vehicle to get there, and I said, 'I didn't hear any and if you members of the jury did, that is up to you to remember, whether you

---

[10] This conclusion is further supported by the fact that attorneys at law and doctors in active practice are expressly excluded from service in second-class counties and in second A and third-class counties. See footnote 9, *supra.*

heard any or not.' That is by recollection, and paraphrased. MR. CRIDER: My recollection is that he said, 'If there are any ways, I didn't hear it.' THE COURT: The objection is overruled."

This ruling was correct.

Under the Act of May 23, 1887, P. L. 158, §10, 19 P.S. §631, "the neglect or refusal of any defendant, actually upon trial in a criminal court, to offer himself as a witness [may not] be treated as creating any presumption against him, or be adversely referred to by court or counsel during the trial." The same safeguards are guaranteed by the Fifth Amendment. *Griffin v. California*, 380 U.S. 609 (1965). However, neither the statute nor the Fifth Amendment completely bars a prosecutor in cases where the defendant has not testified from saying that the state's case is "uncontroverted" or "undisputed." *Holden v. United States*, 393 F.2d 276 (1st Cir. 1968). Such comments are improper if they unequivocally call attention to the defendant's failure to testify. *United States v. Reid*, 415 F.2d 294 (10th Cir. 1969), *cert. denied*, 397 U.S. 1022 (1970). Thus a district attorney may not make persistent and repeated reference to the evidence as "uncontroverted," *Commonwealth v. Davis*, 452 Pa. 171, 305 A.2d 715 (1973), nor may he focus on the fact that only the defendant could have contradicted the evidence, *id.*; *Commonwealth v. Reichard*, 211 Pa. Superior Ct. 55, 233 A.2d 603 (1967); *Desmond v. United States*, 345 F.2d 225 (1st Cir. 1965). *See generally* Annot., 14 A.L.R. 3d 723 (1967).

Here the district attorney's statement did not specifically refer to appellant's failure to testify. The statement was evidently made only once (since only one objection was noted) and then was made not on the district attorney's initiative but in response to the suggestion by appellant's counsel in his argument to the jury that appellant's car could have gotten to where it

was in ways other than being driven by appellant. If, however, appellant did not drive but was driven, the person who drove him might have testified. Thus the district attorney's statement did not refer to evidence that could only be contradicted by appellant. On balance it seems clear that the jury understood the district attorney's statement to be a comment on the lack of evidence presented to substantiate the argument of appellant's counsel, rather than a comment on applicant's failure to take the stand.

## VI.

While appellant's post-trial motions were pending before the court below the Supreme Court rendered its decision in *Commonwealth v. Campana,* 452 Pa. 233, 304 A.2d 432 (1973), "requir[ing] a prosecutor to bring, in a single proceeding, all known charges against a defendant [whether for summary or indictable offenses] arising from a 'single criminal eposide.'" *Id.* at 253, 304 A.2d at 441. Thereupon appellant filed a supplemental post-trial motion in which he noted that following a summary proceeding held before his trial for drunk driving he had paid a fine and costs for illegal parking. He contended that under *Campana* both the drunk driving and illegal parking charges should have been pressed in a single proceeding. However, in *Commonwealth v. Beam,* 227 Pa. Superior Ct. 293, 324 A.2d 549 (1974), this court held that "the rule of Commonwealth v. Campana, should be applied only in those cases in which the first prosecution is brought after the date that case was decided." *Id.* at 301, 324 A.2d at 554. The prosecution against appellant for illegal parking was brought before *Campana* was decided.

The judgment of sentence is affirmed.