Commonwealth, Appellant, *v.* Ward.

Submitted March 24, 1975. Before WATKINS, P. J., JACOBS, HOFFMAN, CERCONE, PRICE, VAN DER VOORT, and SPAETH, JJ.

*John J. Segata, Jr.,* Assistant District Attorney, and *Charles H. Spaziani,* District Attorney, for Commonwealth, appellant.

*Thomas W. Houser,* for appellee.

OPINION BY HOFFMAN, J., September 22, 1975:

The Commonwealth, appellant herein, contends that the lower court erred in granting appellee's motion to arrest judgment of sentence. The lower court held that appellee's arrest was illegal because the police officer lacked statutory authority to make an arrest under Section 2 of the Act of January 14, 1952, P.L. (1951) 2016; 53 P.S. §732.

On June 16, 1973, Officer Howard Frankenfield, an auxiliary policeman with nineteen years experience on the Borough of Hellertown police force, received a radio call to proceed to the scene of an accident in the 600 block of Main Street. The officer arrived at the scene moments later and observed the appellee trying to get out of his car. Appellee's car had struck a parked car just beyond the intersection of Main and Penn Streets. As the officer assisted the appellee, he noticed a strong smell of alcohol emanating from appellee's car. He also observed a liquor bottle and a six-pack of beer in the car. Appellee's gait and speech also led the officer to believe that the appellee was intoxicated. Subsequently, the officer drove appellee, a youth who witnessed the accident, and the owner of the damaged vehicle to police headquarters to complete the investigation.[1]

Prior to questioning appellee further, Sergeant Michael Petrovich gave appellee his *Miranda* warnings. Appellee refused to submit to the "balloon" test for intoxication, but agreed to have a blood test performed. The test, performed at St. Luke's Hospital, revealed an alcohol content of .08. Appellee's performance on other police tests was fair.[2]

The Commonwealth's eyewitness to the accident, Terry Snyder, a sixteen-year-old youth, and the owner of the

---

1. Defense counsel never raised the issue of whether the arrest was illegal because the officer arrested the appellee despite the fact that no misdemeanor took place in the presence of the arresting officer. From the record, it appears that appellee was no longer operating his vehicle when the officer arrived at the scene. See *Commonwealth v. Kloch*, 230 Pa. Superior Ct. 563, 327 A.2d 375 (1974); *Commonwealth v. Reeves*, 223 Pa. Superior Ct. 51, 297 A.2d 142 (1972); *Commonwealth v. Vassiljev*, 218 Pa. Superior Ct. 215, 275 A.2d 852 (1971).

2. The other tests were described by the arresting officer at trial: "He was asked to walk a white line . . . . He could not stay on the line. He walked uneven and a staggering motion . . . . [Another test] was the extending arms, bringing in, touching the nose, and also picking up coins."

damaged vehicle, Drewe Abel, also smelled the odor of alcohol emanating from the appellee and observed his wobbly gait.

On June 27, 1973, Officer Frankenfield swore out a criminal complaint wherein he accused appellee of operating a vehicle while under the influence of alcohol pursuant to §1037 of The Vehicle Code.[3] Thereafter, the Grand Jury returned a true bill of indictment. The matter was tried before President Judge PALMER, who found appellee guilty as charged. On November 19, 1973, appellee filed motions in arrest of judgment and for a new trial. Judge PALMER granted the appellee's motion in arrest of judgment. The Commonwealth appealed from that order.

There are two issues for decision: one, whether auxiliary police are properly called to active duty absent an emergency; two, whether an auxiliary police officer improperly called to duty has the authority to make a lawful arrest.

Section 2 of the Act of January 14, 1952, supra, 53 P.S. §732 provides for the appointment of auxiliary policemen:

"(a) The chief of police of any municipality may nominate persons as auxiliary policemen who have satisfactorily completed such training as he may prescribe.

"(b) All such persons so nominated shall, before they enter upon their duties, be confirmed and sworn by the mayor of the city, the burgess of the borough or town, or the chairman of commissioners or supervisors of the townships.

"(c) Auxiliary policemen shall serve at the pleasure of the chief of police of the municipality nominating them."

Section 4 of the Act, supra, 53 P.S. §734, provides as follows: "The mayor of any city, the burgess of any borough or town, and the chairman of commissioners or super-

___

3. Act of April 29, 1959, P.L. 58, §1037; 75 P.S. §1037.

visors of any township, may call the auxiliary police to active duty during any period of distress, disaster or emergency, except in cases of labor disturbances."

The Commonwealth contends that there are two ways in which auxiliary police may lawfully perform their duties. First, in cases of distress, disaster or emergency, the mayor may call them to active duty. Second, the chief of police may call them at his "pleasure."

The issue has never been decided under the statute. Further, our research has revealed no legislative history that illuminates the problem. It is our view, however, that auxiliary police may be called to active duty only in an emergency and only by "[t]he mayor of any city, the burgess of any borough or town, and the chairman of commissioners or supervisors of any township." Section 732, entitled "Nomination of auxiliary police; confirmation and oath; tenure", does not express an intent to create an alternative method of activating auxiliary police. Rather, it creates a pool of persons who are available for duty if an administrative official determines that an emergency exists. The chief of police may nominate or terminate a person's tenure "at [his] pleasure," but not activate additional police.

"In accordance with the rules relating to the creation of municipal offices generally, . . ., the power to create police offices must be sought in, and exercised in accordance with, the powers granted by the legislature. Thus, *the council or other legislative body* of a municipality, may create such police offices as in their judgment may be required . . ." 62 C.J.S. §569, p. 1093, Municipal Corporations. (Emphasis added; footnotes omitted). The Borough Code, Act of February 1, 1966, P.L. (1965) 1656, No. 581, §1121; 53 P.S. §46121, authorizes the appointment and suspension of police: "Borough council may, subject to the civil service provisions of this act, . . ., appoint and remove, or suspend, or reduce in rank, one or more suitable persons, . . ., as borough policemen, . . .

". . . . The borough may, by ordinance establish a police department . . . subject to the civil service provisions of this act. . . . The mayor may . . . delegate to the chief of police . . . *supervision* over and *instruction* to subordinate officers in the manner of performing their duties." (Emphasis added).

If we were to read the statute as the Commonwealth urges, then a local police chief, by activating auxiliary police, could circumvent civil service requirements and the requirement that appointment of police officers be authorized by ordinance.

Thus, auxiliary police may be called to active duty only in cases of distress, disaster or emergency. In *Scaccia v. Old Forge Borough*, 373 Pa. 161, 163-64, 94 A.2d 563, 564 (1953), the Supreme Court addressed the question of whether an emergency existed that justified the Burgess's appointment of a special policeman:

"It is difficult to define an emergency but as a generalization it is a sudden or unexpected event which creates a temporarily dangerous condition usually necessitating immediate or quick action. . . . Ordinary conditions or customarily existent conditions are not emergencies."

The Commonwealth does not argue that an emergency existed on June 16, 1973. The lower court found that "[t]here was no 'period of distress, disaster, or emergency' which permitted the auxiliary police officer in this case to be called to active duty. . . ." Absent an emergency, an auxiliary police officer has no power to act under color of law. See Act of January 14, 1952, supra, 53 P.S. §735, that confers power to the police only when called to active duty.

In *Commonwealth v. Troutman*, 223 Pa. Superior Ct. 509, 302 A.2d 430 (1973), we addressed an analogous factual situation. Therein, two Penn Hills Township police officers pursued the defendant, suspected of drunk driving, into the neighboring Borough of Verona to make an arrest for a misdemeanor. We noted that "the legislature

has not extended the authority to township police officers to cross township lines in order to make an arrest in hot pursuit of a misdemeanant. . . . Until the legislature grants such power to township police officers, this court cannot permit local law enforcement officials to infringe upon the jurisdiction of other local law enforcement agencies by crossing township lines to arrest." 223 Pa. Superior Ct. at 511, 302 A.2d at 431-432. Absent such legislation, we held that the lower court properly dismissed the information because it was based on an illegal arrest.[4]

It follows from the analysis of the Act of January 14, 1952, supra, that the arrest of appellee by auxiliary Officer Frankenfield was illegal. He was not on active duty during an emergency; thus he could not act with authority of law.[5] Thus, the lower court was correct when it held that the testimony of the officer was inadmissible as the product of an illegal arrest.

The only question remaining is whether the lower court's disposition of the case was correct. The lower

---

4. Subsequent to our decision in *Troutman*, the legislature in fact extended the power of local police to permit them to pursue a fleeing misdemeanant into neighboring jurisdiction: "Any police officer in the employ of a county, city, borough, town or township may arrest, with or without a warrant, any felon or person who has committed a misdemeanor or summary offense beyond the territorial limits of the political subdivision employing such officer for such offense committed by the offender within the political subdivision employing the police officer if such officer continues in pursuit of the offender after commission of the offense. . . ." Act of 1963, Aug. 6, P.L. 511, No. 267, §1; as amended 1973, Nov. 2, No. 109, §1, imd. effective; 19 P.S. §11.

5. The Commonwealth does not press the point that we should treat the officer's arrest as a valid citizen's arrest. First, it is questionable whether the arrest would have been valid as a citizen's arrest. See 3 P.L.E. §5 Arrest, p. 38-39, and cases cited therein. Second, we rejected the same argument in *Commonwealth v. Troutman*, supra, at 512, 302 A. 2d at 432: "Once an officer invokes the power of the township to make an arrest, he cannot preserve the legality of the arrest by labelling his behavior a citizen's arrest."

court did not grant appellant a new trial, but after ruling the officer's testimony inadmissible, the court arrested judgment. We believe that the proper remedy would have been to grant appellant a new trial. In passing upon the motion in arrest of judgment, the court must consider all the evidence presented at trial, whether or not such evidence was properly admitted. *Commonwealth v. Tabb*, 417 Pa. 13, 207 A.2d 884 (1965).

The order of the lower court is vacated and the case remanded for a new trial.

———

DISSENTING OPINION BY PRICE, J.:

I must disagree with the conclusion of the majority concerning the purpose of the Act of Jan. 14, 1952, P.L. (1951) 2016, §1 (53 P.S. §731) *et seq.*, and the extent of the powers conveyed therein. I believe the Act was intended to be used as a means of appointing part-time police officers who may be called into active duty by the chief of police in non-emergency situations, and by the mayor during emergencies.

The historical note following Section 731 states:

"*Title of Act* [*Police Force and Firemen*]: An Act providing for *supplementing the police forces of cities, boroughs, towns and townships, for the appointment,* powers and control of auxiliary police therein, *and for the transfer* during disasters and emergencies of such auxiliary police, members of the regular police forces, and police equipment thereof. 1952, Jan. 14, P.L. (1951) 2016." (emphasis added)

The interpretation placed upon this Act by the majority eliminates the supplementation of the police force by considering only the second and third stated purposes of the Act. However, the purposes are written conjunctively, and I would read the Act so as to give effect to all three clauses quoted *supra*.

Moreover, the Borough Code, Act of Feb. 1, 1966, P.L. (1965) 1656, No. 581, §1121 (53 P.S. §46121), contains the following cross-reference, which indicates that the Acts are not mutually exclusive: "Police force, see section 731 et seq. of this title."

I do not believe that the Act of Jan. 14, 1952, is at odds with the Borough Code. That part of Section 46121 of the Borough Code which discusses civil service requirements states:

"The borough may, by ordinance establish a police department consisting of chief, captain, lieutenant, sergeants, or any other classification desired by the council, and council may, subject to the civil service provisions of this act, if they be in effect at the time, designate the individuals assigned to each office, but the mayor shall continue to direct the manner in which the persons assigned to the office shall perform their duties. The mayor may, however, delegate to the chief of police or other officers supervision over and instruction to subordinate officers in the manner of performing their duties. The mayor may appoint special policemen during an emergency in which the safety and welfare of the borough and the public is endangered and *auxiliary policemen may be appointed as provided by general law.*" (emphasis added)

The last sentence of Section 46121 specifically permits the appointment of auxiliary policemen without regard to the civil service requirements detailed in Section 46121.

Furthermore, I do not believe that this appellee has standing to attack the statutory authority of auxiliary policemen who make arrests. "The general rule, however, is that only the person whose rights have been violated has standing to attack the validity of the action resulting in the violation. This is so with respect to personal rights under the Fourth Amendment, (citations omitted) as well as under the Fifth, (citation omitted)." *Commonwealth v. Russell,* 225 Pa. Superior Ct. 133, 136-37, 310 A.2d 296, 298 (1973).

The stated purpose of the Act of 1952 is to supplement the police force, and consequently, to offer increased police protection to the citizens of the Commonwealth. Appellee has not proven that *his* arrest was improper. He merely contends that the arresting officer was improperly commissioned through a ministerial act which did not conform to appellant's interpretation of the Act of 1952.

This distinction is most significant. Appellee recognizes that the Act of 1952 establishes a ministerial function of a governmental body; *i.e.,* to appoint auxiliary policemen in the manner set forth in the Act. To my view, persons who can be aggrieved by an improper appointment to the auxiliary police force are those who prove a direct injury as a result of the manner in which the Act is effectuated.

If a regular police officer, for example, believes that an auxiliary officer is employed, during a state of non-emergency, by a borough which would otherwise be subjected to the civil service act, he may have standing to contest the appointment. This is not to suggest that a decision on the merits would, necessarily, be found in his favor, but rather to indicate the type of situation which might indicate an injury sufficient to create a cause of action based on the Act of 1952.

However, I do not believe that the validity of the Act of 1952, or the manner in which it is put into effect, is subject to a collateral attack by a non-aggrieved person. Appellee created the circumstances which led to his arrest and does not dispute his criminal liability. Whether he was arrested by a full-time police officer or by an auxiliary police officer, appellee was not "aggrieved" as that word is used to create standing.

The appointment of an auxiliary officer rather than a regular officer in no way affects the rights of the citizens at large. The function of public protection is as adequately served by auxiliary officers as by regular policemen.

Therefore, I do not believe a suspect has standing to contest, nor do I believe it sound policy to enable a suspect to look behind the badge of the arresting officer and contest the validity of his appointment to the force. That suspect is not aggrieved by the label attached to the arresting officer.

In the instant case, there is no doubt that appellant committed the offense with which he is charged. There is also no doubt that his arrest was properly performed, and that he was afforded every right to due process of law. He has not shown that his rights have been violated. To hold this arrest "illegal" does not further the purpose of the Act of 1952, and is not a proper remedy for a person who has shown no injury caused by the arrest.

I would reverse the order of the lower court granting the arrest of judgment and remand for sentencing.

WATKINS, P.J., joins in this dissenting opinion.